WESLEY H. MORGAN AND HARRIETT B. MORGAN, ET AL.,[1] PETITIONERS, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1156-65—1158-65. Filed September 30, 1966.

*Julie M. Reardon* and *Gene W. Reardon*, for the petitioners.
*Harold Friedman*, for the respondent.

[1] Proceedings of the following petitioners are consolidated herewith: James C. Collum and Kathleen O. Collum, docket No. 1157–65, and Milton H. Collum and Janie Lou Collum, docket No. 1158–65.

DRENNEN, *Judge:* In these consolidated proceedings respondent determined deficiencies in petitioners' income tax for the taxable year 1961 as follows:

| Docket No. | Petitioner | Deficiency |
|---|---|---|
| 1156-65 | Wesley H. Morgan and Harriett B. Morgan | $5,099.10 |
| 1157-65 | James C. Collum and Kathleen O. Collum | 390.00 |
| 1158-65 | Milton H. Collum and Janie Lou Collum | 3,384.12 |

By amendment to answer respondent has asserted claims for increased deficiencies in income tax against each of the joint petitioners, over and above those set forth above, for the taxable year 1961 as follows:

| Docket No. | Petitioner | Increased deficiency |
|---|---|---|
| 1156-65 | Wesley H. and Harriett B. Morgan | $2,637.88 |
| 1157-65 | James C. and Kathleen O. Collum | 279.00 |
| 1158-65 | Milton H. and Janie Lou Collum | 2,166.90 |

The issues presented for our consideration are:

(1) Whether all or any part of the amounts claimed on petitioners' returns as a loss incurred by Petroleum Drilling Co., a partnership (totaling $29,503) should be accorded ordinary loss treatment under section 1244, I.R.C. 1954,[2] as contended by petitioners, or as capital loss ($8,400 long term and $21,103 short term) under section 165(g), as determined by respondent in his notices of deficiency; and (2), in the alternative, whether $21,103 of the total $29,503 loss incurred by Petroleum Drilling Co. should be allowable as an ordinary and necessary business expense of the partnership, as urged by petitioners, or, as alleged by respondent in his amended answer, should be treated as nondeductible.

All other issues raised by the original petition in docket No. 1158-65 were conceded by petitioners in the opening statement.

In docket No. 1157-65, a medical expense adjustment is purely computational and will follow from a determination of the aforesaid issues.

The issues to be decided are entirely dependent on whether Petroleum Drilling Co., a partnership in which the individual petitioners herein were the partners, is entitled to a deduction either as an ordinary loss on section 1244 stock, or as an ordinary and necessary business expense under section 162, or as a capital loss under section 165, for amounts, totaling $29,503, advanced by it to or for the benefit of Junction Drilling Co., a corporation in which the partnership owned about 76 percent of the stock.

---

[2] All section references are to the Internal Revenue Code of 1954 unless otherwise indicated.

FINDINGS OF FACT

Some of the facts are stipulated and are found accordingly.

Petitioners Wesley H. Morgan and Harriett B. Morgan are husband and wife, and reside at 4949 Lake Shore Drive, Littleton, Colo. Petitioners James C. Collum and Kathleen O. Collum are husband and wife, and reside at 1161 South Vivian, Denver, Colo. Petitioners Milton H. Collum and Janie Lou Collum are husband and wife, and reside at 5245 Sky Trail, Littleton, Colo. All petitioners herein filed income tax returns for the calendar year 1961 with the district director of internal revenue at Denver, Colo. Each petitioner-wife is involved herein solely by virtue of having filed a joint return with her husband and hereinafter petitioner or petitioners is used to refer to the husband or husband-petitioners.

Petroleum Drilling Co. was a partnership in existence prior to and during the taxable period involved herein and was comprised of Wesley H. Morgan, hereinafter referred to as Morgan, Milton H. Collum, and James C. Collum, who owned 50-, 40-, and 10-percent interests in the partnership, respectively. Petroleum Drilling Co. is sometimes hereinafter referred to as Petroleum or the partnership. Its fiscal year ends September 30.

Junction Drilling Co., hereinafter sometimes referred to as Junction, was a corporation organized under the laws of the State of Colorado on March 2, 1961. Junction's principal business was to drill core holes and deep exploratory holes for minerals. It was dissolved on September 28, 1961.

Petroleum Geophysical International Corp., hereinafter sometimes referred to as International, was a corporation organized under the laws of the State of Colorado in 1958. Apparently 50 percent of the capital stock of International was owned by Petroleum and the remaining 50 percent of the stock was owned by an unrelated party. International's principal business was geophysical and geological exploration for minerals, primarily in the Philippines.

Uranium Drilling & Exploration, Inc., hereinafter sometimes referred to as Uranium or UDX, was a corporation organized under the laws of the State of Colorado in 1954. During the period here involved and at the time of its dissolution in 1962 Petroleum owned about 96 percent of the capital stock of UDX. Some of the remaining shares were owned by Charles E. Lichtenwalter, hereinafter sometimes referred to as Lichtenwalter.

Although the articles of incorporation of Junction provided that its principal office was to be located in Grand Junction, Colo., all of the books and records of Petroleum, Junction, Uranium, and International were kept at 2011 Glenarm, Denver, Colo., under the direction

of Lichtenwalter. Lichtenwalter was the accountant for Petroleum and he was also an officer and/or director of Junction, Uranium, and International.

On or before February 20, 1961, Milton H. Collum, Morgan, L. W. Eklund, hereinafter referred to as Eklund, Lichtenwalter, and some other individuals discussed organizing a new corporation to engage in a drilling venture which became available at about that time. The new corporation was to be formed for the purpose of drilling core holes and deep exploratory holes to discover minerals. All of the petitioners had experience in the mineral exploration business and were aware of the economic hazards incident to such a venture.

On February 20, 1961, a meeting was held in Denver, Colo., to organize the new company, which was to be called Junction Drilling Co. The incorporators of Junction were Eklund, J. L. Wood, and Lichtenwalter. The minutes of this meeting reflect that the above individuals, being all the incorporators and all the subscribers to the capital stock and stockholders of Junction, were present. The articles of incorporation were approved and the three incorporators were recognized as the first directors of the corporation. The articles provided that the corporation should have perpetual existence and that its capital stock should consist of 49,000 shares, with a par value of $1 per share, and should be issued as fully paid stock and nonassessable. The articles were signed by the incorporators on February 20, 1961, and filed with the secretary of state of Colorado on March 2, 1961. A certificate of incorporation was issued to Junction under date of March 2, 1961.

The first meeting of the board of directors of Junction, consisting of Eklund, Wood, and Lichtenwalter, was held in Denver on February 20, 1961. At this meeting Eklund was elected president of the corporation, Wood was elected vice president, and Lichtenwalter was elected secretary-treasurer. The bylaws were adopted, a form of stock certificate was approved, the Denver United States National Bank, hereinafter referred to as the Denver Bank, was designated as the depository for the corporation's funds with Eklund and Lichtenwalter being authorized to write checks on the account, and the president and secretary-treasurer were authorized to borrow, from time to time, from the Denver Bank on behalf of the company such sums of money as they may deem necessary or advisable. A salary of $7,200 per year was fixed for the president with no salaries for the other officers.

A contract for drilling in Utah was obtained in the name of Junction, to begin at once. Milton H. Collum and others knew of a used drilling rig located in Oklahoma which was then available and it was decided that it should be acquired for the corporation promptly

before someone else bought it. This equipment was acquired and used by Junction in the commencement of its business. On February 23, 1961, Petroleum executed a check to the Denver Bank in the amount of $8,400 to satisfy a sight draft for this drilling equipment.[3]

The payment of $8,400 was reflected on the books of Petroleum by an entry dated February 23, 1961, showing a credit to the cash account and a debit to the investments account.

Under the same date, February 23, 1961, an entry on the books of Junction reflects a credit to the capital stock account—account No. 200—of $8,400 with the debit being to equipment accounts of Junction. The transaction is reflected on the books of Junction as an exchange of equipment for stock, the journal entry being as follows:

```
1961
Feb. 23   Drilling equipment_____  $18, 406. 40
          Auto and trucks_____    600. 00
               Capital stock_____                $8, 400. 00
               Note payable UDX_____                10, 606. 40
          To record the purchase of
          equipment. Sight draft paid by
          Petroleum Drilling Co. chk for
          $8400.00 (stock) and UDX chk
          for $10,606.40 (note). Equip-
          ment as follows:
               1–Franks   drawworks,   GMC
                  power   unit,   mounted   on
                  trailer _____  $10, 006. 40
               1–Gardner Denver mud pump,
                  GMC power unit, trailer_____     7, 400. 00
               1–Doghouse on trailer_____     1, 000. 00
               1–1950 Chevrolet truck_____       300. 00
               1–1948 1H truck_____       300. 00
```

The notes payable account of Junction reflects the following debits and credits:

| 1961 | | Debits | Credits |
|---|---|---|---|
| Feb. 23_____ | UDX_____ | | $10, 606. 40 |
| Feb. 27_____ | UDX_____ | | 4, 393, 60 |
| Mar. 10_____ | International_____ | | 15, 000. 00 |
| Apr. 20_____ | Denver Bank_____ | | 30, 000. 00 |
| May 10_____ | Denver Bank_____ | | 15, 000. 00 |
| Sept. 30_____ | UDX_____ | $15, 000 | |
| Sept. 30_____ | International_____ | 15, 000 | |
| Sept. 30_____ | Denver Bank_____ | 45, 000 | |

On February 27, 1961, Junction received cash in the amount of $4,393.60 from UDX, and on March 10, 1961, Junction received cash of $15,000 from International. These amounts were used for operating expenses.

---

[3] Apparently UDX also issued its check in the amount of $10,606.40 to help pay for this equipment.

The cash receipts journal of Junction reflects the following entries, among others:

| 1961 | | Bank debit |
|------|------|-----------|
| Feb. 27 | UDX | $4,393.60 |
| Mar. 10 | International | 15,000.00 |
| Apr. 20 | Denver Bank | 30,000.00 |
| May 5 | Eklund | 2,400.00 |
| May 10 | Denver Bank | 15,000.00 |
| May 15 | Lichtenwalter | 250.00 |
| Sept. 26 | Petroleum | 50,352.88 |
| Sept. 26 | Lichtenwalter | 627.00 |
| Sept. 26 | Petroleum | 21,103.00 |
| Sept. 26 | Eklund | 3,996.00 |

The capital stock account of Junction reflects the following:

| 1961 | Items [1] | Credits |
|------|-----------|---------|
| Feb. 23 | | $8,400 |
| May 5 | | 2,400 |
| May 15 | | 250 |
| Sept. 30 | | 627 |
| Sept. 30 | | 21,103 |
| Sept. 30 | | 3,996 |
| Sept. 30 | | 2,033 |

[1] The exhibit does not indicate to whom the stock was issued but the stipulation of facts and other evidence indicate that the 8,400 and 21,103 shares were issued to Petroleum, the 2,400 and 6,029 ($3,996 and $2,033) shares were issued to Eklund, and the 250 and 627 shares were issued to Lichtenwalter. Eklund paid for his 6,029 shares, $3,996 by check and $2,033 as a credit for unreimbursed travel, etc., expenses.

The stock register book of Junction reflects that certificates of its stock were issued as follows:

| Date | Certificate No. | Number of shares | Issued to— |
|------|-----------------|------------------|------------|
| *1961* | | | |
| May 29 | 1 | 8,400 | Petroleum. |
| May 29 | 2 | 2,400 | Eklund. |
| May 29 | 3 | 250 | Lichtenwalter. |
| Sept. 26 | 4 | 627 | Lichtenwalter. |
| Sept. 26 | 5 | 21,103 | Petroleum. |
| Sept. 26 | 6 | 6,029 | Eklund. |

None of the above certificates are attached to the stubs in the book. Canceled U.S. internal revenue documentary stamps are affixed on each of the certificate stubs except the stub for certificate No. 4, and are marked canceled as of February 26, 1964. These stamps were purchased and affixed at the suggestion of an internal revenue agent given on that date. Certificate of stock No. 3 issued to Lichtenwalter was received in evidence and bore the notation "Subject to Small Business Tax Revision Act of 1958" on the face thereof. None of the other stock certificates was offered in evidence but Lichtenwalter testified that all of the certificates issued bore the same notation.

The minute records of Junction reflect that a meeting of the board of directors was held on April 3, 1961. The minutes of this meeting read as follows:

MINUTES OF SPECIAL MEETING OF BOARD OF DIRECTORS
OF JUNCTION DRILLING COMPANY

A special meeting of the Board of Directors of Junction Drilling Company was held at 5875 South Fox Street, Littleton, Colorado, County of Arapahoe, State of Colorado, on April 3, 1961 at 9 a.m., pursuant to consent and waiver of notice evidenced by the signatures of the directors subscribed to these minutes.

Those present were: L. W. Eklund, J. L. Wood and Charles E. Lichtenwalter, constituting all of the directors of the Company.

The meeting was called to order by the president, L. W. Eklund, who stated the purposes of this special meeting.

Upon motion made, seconded and duly carried, authorization was given for the original issuance of 12,000 shares of the Capital stock of the Company at $1.00 per share. Mr. Eklund indicated a desire to purchase 2,400 shares of the original issue of the Capital stock of the Company, and further indicated a desire to obtain an option to buy additional shares in the future. The matter was discussed and, upon motion made, seconded and duly carried, the following resolution was adopted.

RESOLVED that L. W. Eklund is hereby granted an option to buy 1,200 additional shares of the Capital stock of the Company at $1.00 per share at any time during the two-year period ending April 3, 1963.

On motion duly made and carried the following plan in connection with the original issue of the Capital stock of this corporation was adopted:

(a) This plan is being adopted for the purpose of complying with the "Small Business Tax Revision Act of 1958;" there being no other stock offering outstanding:

(b) All capital stock originally issued by this corporation to any individual or partnership during the period February 20, 1961 to February 20, 1962, for money or other property shall be subject to the plan:

(c) Such plan shall not include stock issued in exchange for stock, securities or services rendered:

(d) This corporation does not have in excess of One Million Dollars equity capital and its capital stock subject to this plan is not in excess of $500,000.00:

(e) Every stock certificate issued under this plan shall recite that it is "Subject to Small Business Tax Revision Act of 1958."

On motion duly made and carried, the meeting was adjourned.

(S) L. W. Eklund,
L. W. EKLUND
(S) J. L. Wood,
J. L. WOOD
(S) Charles E. Lichtenwalter,
CHARLES E. LICHTENWALTER

The plan set out in the minutes was copied by Lichtenwalter from a plan adopted by some other corporation with which he was familiar.

It became apparent to Milton H. Collum and his associates not long after Junction commenced its operations that it was improbable that Junction could be operated profitably with the management it had and the funds available to it; and Junction did operate at a loss

throughout its existence. Sometime during this period the partners of Petroleum and the other stockholders of Junction agreed that if it became necessary for Junction to raise more money to pay off its creditors, they would contribute additional capital, in proportion to their original holdings, in a sufficient amount to meet the obligations to Junction's creditors. The partners and some of their other enterprises did business with these creditors.

On September 15, 1961, the directors of Junction adopted a resolution of dissolution of the corporation which was approved by the stockholders. On or about September 25, 1961, all of the automobiles, trucks, and drilling equipment of Junction were sold to Petroleum for approximately $50,000, which was approximately the depreciated book value thereof on Junction's books. After the sale of its assets Junction needed additional funds in the amount of approximately $25,726 to pay off all of its debts and obligations, including the notes payable to UDX and International in the face amount of $15,000 each. Thereupon Petroleum paid $21,103, Lichtenwalter paid $627, and Eklund paid $3,996 in cash to Junction. Eklund also canceled an indebtedness owed to him by Junction for expenses in the amount of $2,033. The records of Junction indicate that on September 26, 1961, Petroleum purchased 21,103 additional shares of its stock, Lichtenwalter purchased an additional 627 shares, and Eklund purchased an additional 6,029 shares, and that stock certificates were issued to them for those shares on that date.

On September 26, 1961, Junction paid all of its outstanding obligations, which left it with no assets. Among the obligations paid were notes payable to the Denver Bank in the amount of $45,000 plus interest in the amount of $663.64, and the notes payable to UDX and International in the amounts of $15,000 each. No interest was paid on the latter two obligations.

On September 28, 1961, the secretary of state of Colorado issued a certificate of dissolution of Junction.

International was organized in November 1958 by Milton H. Collum, Morgan, and Lichtenwalter. Its major business activity consisted of engaging in foreign drilling, primarily in the Philippines. By early 1961 its work in the Philippines was complete and the corporation had no other active operations.

On April 27, 1961, at a special stockholders meeting International adopted a plan of complete liquidation "as soon as practicable, and, in any event, within a twelve month period beginning on the date of the adoption of this plan of liquidation and dissolution." On April 3, 1962, the corporate officers filed a statement of intent to dissolve with the secretary of state of Colorado. International was formally dissolved on April 4, 1962.

The president of International at that time was Morgan and the secretary-treasurer was Lichtenwalter. International's directors on April 27, 1961, and on April 3, 1962, were Morgan, Milton H. Collum, and Lichtenwalter.

On July 7, 1962, the stockholders of UDX adopted a plan of complete liquidation. The officers and directors of the company at that time were Milton H. Collum, Morgan, and Lichtenwalter. UDX was formally dissolved on October 23, 1962.

Petroleum received a liquidating distribution from International in the amount of $10,000 on May 5, 1961, and another in the amount of $8,462.56 in April 1962. It reported a total gain of $15,962.56 on these distributions. Petroleum also received a liquidating distribution in the amount of $143,477.40 from UDX on September 23, 1962, and reported $107,649.90 of this amount as gain on its partnership return for its fiscal year ended September 30, 1962.

On October 12, 1961, Junction filed a U.S. Corporation Income Tax Return, Form 1120, for a period commencing March 2, 1961, and ending September 28, 1961. This return of Junction reflects a "net operating loss" of $38,809 computed in the return as follows:

| | |
|---|---|
| Gross receipts from operations | $37,634.01 |
| Net gains | 1,220.49 |
| Total income | 38,854.50 |
| Total deductions | $77,663.50 |
| Net loss | ($38,809.00) |

On its partnership return of income for its fiscal year ending September 30, 1961, Petroleum reported ordinary net income of $46,260.25 and a "Loss on small business stock—section 1244" in the amount of $29,503, the latter being allocated $14,751.50 to Morgan, $11,801.20 to Milton H. Collum, and $2,950.30 to James C. Collum. Attached to the return was the following statement relative to the section 1244 loss:

INFORMATION RELATIVE TO ORDINARY LOSS ON STOCK UNDER SECTION 1244
YEAR ENDED SEPTEMBER 30, 1961

1) Name and address of corporation issuing stock:
   Junction Drilling Company
   2011 Glenarm
   Denver 5, Colorado

2) Stock in above corporation—29,503 shares $1.00 par was acquired directly from Junction Drilling Company as previously unissued stock for cash in the amount of $29,503.00.

3) No nontaxable transaction was involved as to any of the stock of Junction Drilling Company.

4) Junction Drilling Company was organized on March 2, 1961 to engage in deep oil well test drilling with a plan to issue stock qualified under Section 1244. It quickly became apparent that the equipment and personnel of the company were not adequate. The company's contract was cancelled and when no opportunities to engage in drilling at rates likely to be profitable could be found, a decision to liquidate was made. Each stockholder purchased sufficient additional stock so that creditors could be paid in full. The result of this action was that the exact amount paid in par stock represents the shareholders loss. Junction Drilling Company was entirely liquidated September 26, 1961.

On their income tax returns for the taxable year 1961, petitioners Wesley H. and Harriett B. Morgan claimed $14,751.50, petitioners James C. and Kathleen O. Collum claimed $2,950, and petitioners Milton H. and Janie Lou Collum claimed $11,801.20, as their partnership distributable interests in the alleged section 1244 ordinary stock loss.

In his notices of deficiency respondent disallowed the deductions claimed by petitioners for their proportionate shares of the partnership loss on the Junction stock ($29,503) but allowed each petitioner his proportionate share of $8,400 as a long-term capital loss and of $21,103 as a short-term capital loss, with the explanation that the loss on the worthlessness of Junction stock is governed by section 165(g) instead of section 1244 of the Internal Revenue Code. Petitioners each alleged error with respect to this determination in their respective petitions filed herein. Respondent's original answer to each petition was in the form of a general denial. By amended answers, filed at the time these cases were called for trial, respondent alleged "In further support of the respondent's determination that a claimed ordinary loss deduction on alleged 1244 stock is not allowable in this case" that there was no bona fide purchase of section 1244 stock by Petroleum in September 1961 and hence no loss of any kind, except for its original investment of $8,400, is allowable to Petroleum, and, further, that if any loss is allowable on the purchase of stock by Petroleum in September 1961, it is allowable only as a capital loss as originally determined.

In "replies" filed by petitioners to respondent's amended answers, petitioners alleged, in the alternative, that if Petroleum's payment to Junction in September 1961 was not for the purchase of stock, then such payment was an ordinary and necessary business expense of Petroleum, deductible in full by the partnership.

OPINION

The primary question is whether the amounts of $8,400 and $21,103 paid out by Petroleum on February 23, 1961, and September 26, 1961, respectively, were paid for stock which qualified as "section

1244 stock" under section 1244 of the code, the pertinent parts of which are set out in the footnote below.[4]

To qualify as section 1244 stock, the stock must be issued pursuant to a plan adopted by a small business corporation. Looking first at the $8,400 transaction, it is not possible to determine with certainty from the evidence whether the stock eventually issued for the $8,400 was issued pursuant to a plan adopted by Junction or whether the plan set out in the minutes of the meeting of the board of directors of Junction held on April 3, 1961, was adopted as an afterthought.

---

[4] SEC. 1244. LOSSES ON SMALL BUSINESS STOCK.

(a) GENERAL RULE.—In the case of an individual, a loss on section 1244 stock issued to such individual or to a partnership which would (but for this section) be treated as a loss from the sale or exchange of a capital asset shall, to the extent provided in this section, be treated as a loss from the sale or exchange of an asset which is not a capital asset.

\* \* \* \* \* \* \*

(c) SECTION 1244 STOCK DEFINED.—

(1) IN GENERAL.—For purposes of this section, the term "section 1244 stock" means common stock in a domestic corporation if—

(A) such corporation adopted a plan after June 30, 1958, to offer such stock for a period (ending not later than two years after the date such plan was adopted) specified in the plan,

(B) at the time such plan was adopted, such corporation was a small business corporation,

(C) at the time such plan was adopted, no portion of a prior offering was outstanding,

(D) such stock was issued by such corporation, pursuant to such plan, for money or other property (other than stock and securities), and

(E) such corporation, during the period of its 5 most recent taxable years ending before the date the loss on such stock is sustained (or if such corporation has not been in existence for 5 taxable years ending before such date, during the period of its taxable years ending before such date, or if such corporation has not been in existence for one taxable year ending before such date, during the period such corporation has been in existence before such date), derived more than 50 percent of its aggregate gross receipts from sources other than royalties, rents, dividends, interest, annuities, and sales or exchanges of stock or securities (gross receipts from such sales or exchanges being taken into account for purposes of this subparagraph only to the extent of gains therefrom) ; except that this subparagraph shall not apply with respect to any corporation if, for the period referred to, the amount of the deductions allowed by this chapter (other than by sections 172, 242, 243, 244, and 245.) exceed the amount of gross income.

Such term does not include stock if issued (pursuant to the plan referred to in subparagraph (a)) after a subsequent offering of stock has been made by the corporation.

(2) SMALL BUSINESS CORPORATION DEFINED.—For purposes of this section, a corporation shall be treated as a small business corporation if at the time of the adoption of the plan—

(A) the sum of—

(i) the aggregate amount which may be offered under the plan, plus

(ii) the aggregate amount of money and other property (taken into account in an amount, as of the time received by the corporation, equal to the adjusted basis to the corporation of such property for determining gain, reduced by any liabilities to which the property was subject or which were assumed by the corporation at such time) received by the corporation after June 30, 1958, for stock, as a contribution to capital, and as paid-in surplus,

does not exceed $500,000 ; and

(B) the sum of—

(i) the aggregate amount which may be offered under the plan, plus

(ii) the equity capital of the corporation (determined on the date of the adoption of the plan),

does not exceed $1,000,000.

For purposes of subparagraph (B), the equity capital of a corporation is the sum of its money and other property (in an amount equal to the adjusted basis of such property

This confusion, which must militate against petitioners who have the burden of proof, is unfortunate because this investment in the stock of a small business corporation by Petroleum appears to be the type of investment which section 1244 was enacted to encourage.[5] Had the incorporators of and investors in Junction had good and timely legal advice, this confusion would probably have been avoided, but section 1244 being designed to provide a tax benefit to a rather limited group of taxpayers as it is, we feel that qualification for those benefits requires strict compliance with the requirements of the law and the regulations promulgated pursuant to the specific instructions therefor included in section 1244(e).

The book entries of both Petroleum and Junction indicate quite clearly that the $8,400 was paid out by Petroleum for stock of Junction prior to the formal adoption of a section 1244 plan by Junction on April 3, 1961. Petitioners argue first that even if the stock must be deemed to have been issued prior to April 3, nevertheless it was issued pursuant to an informal plan discussed by the incorporators prior to incorporation of Junction that was simply reduced to writing in the minutes of April 3. We cannot agree that this would constitute compliance with the requirements of section 1244(c).

Section 1.1244(c)–1(c), Income Tax Regs., requires that the plan be in writing. While the statute itself does not specify such requirement, it finds support in the legislative history of section 1244; in the House committee report it is stated that "Such plan must be in writing." H. Rept. No. 2198, 85th Cong., 2d Sess., p. 8, 1959–2 C.B. 709, 714. In addition, section 1244(c) requires that the stock be offered "for a period (ending not later than two years after the date such plan was adopted) specified in the plan," and contains other requirements that must be ascertained at the time the plan is adopted, compliance with which would be difficult to determine unless the date of adoption and the terms of the plan are reduced to writing. We believe the requirement of the regulation is reasonable and that to

---

for determining gain), less the amount of its indebtedness (other than indebtedness to shareholders).

(d) SPECIAL RULES.—

  (1) LIMITATIONS ON AMOUNT OF ORDINARY LOSS.—

\* \* \* \* \* \* \*

  (B) INCREASES IN BASIS.—In computing the amount of the loss on stock for purposes of this section, any increase in the basis of such stock (through contributions to the capital of the corporation, or otherwise) shall be treated as allocable to stock which is not section 1244 stock.

\* \* \* \* \* \* \*

(e) REGULATIONS.—The Secretary or his delegate shall prescribe such regulations as may be necessary to carry out the purposes of this section.

[5] See H. Rept. No. 2198, to accompany H.R. 13382, Small Business Tax Revision Act of 1958 (which eventually was enacted as tit. II, Pub. L. 85–866, 72 Stat. 1606, 1676, H.R. 8381), 85th Cong., 2d Sess., p. 4, wherein it is stated: "This provision is designed to encourage the flow of new funds into small business."

**890**

qualify as section 1244 stock the stock must be issued pursuant to a written plan.[6] Consequently, we cannot find that a plan which would meet the requirements of section 1244 was adopted by Junction prior to April 3, 1961.

The issuance of the 8,400 shares of stock pursuant to an informal oral plan discussed by the incorporators at the time of incorporation would not qualify the stock as section 1244 stock. In applying this statute, which grants preferential treatment to the taxpayer, we think it would frustrate and be inimical to the congressional intent if the taxpayer is permitted to control the tax consequences of his transactions by issuing stock pursuant to oral plans which are "formalized" at some propitious moment in the future. Furthermore there is no proof that any specific plan or terms of a plan were discussed and/or adopted at the time of incorporation which were later reduced to writing in the minutes of the April 3 meeting.

Petitioners' second argument is that the records show that the stock certificate for the 8,400 shares was not physically issued until May 29, 1961, which was after the written plan was adopted, that prior to that date Petroleum had simply loaned Junction the money to acquire the equipment, that the account payable was applied to the purchase price of the stock on May 29, and hence the stock was issued pursuant to the plan adopted April 3. We cannot agree with this argument either.

Section 1244 does not define the word "issued" as used therein; we therefore must assume that it was used in its ordinary corporate sense. *Hanover Bank* v. *Commissioner*, 369 U.S. 672, 687; *In Re Nissen's Estate*, 345 F. 2d 230. Generally, the issuance of a certificate is not necessary to constitute one a stockholder. Also, the date of delivery of the certificate is not controlling as to the date a subscriber becomes a stockholder. The stock certificate is merely the documentary evidence of membership in a corporate organization and an attestation of the stockholder's ownership of shares of interest therein. 11 Fletcher, Cyclopedia of the Law of Private Corporations, secs. 5092–5094 (1958 rev.) ; Fletcher, *supra* secs. 1375–1376, 1406, 1427–1428 (1965 rev.). Likewise, when stock is paid for, it is normally considered issued in fact, irrespective of the manual issuance of the certificate. *W. F. Marsh*, 12 T.C. 1083; 11 Fletcher, *supra* sec. 5159; 3B Mertens, Law of Federal Income Taxation, sec. 22.104, pp. 446–447. In *Thomas* v. *Thomas*, 70 Colo. 29, 197 Pac. 243, the court held that stock certificates are merely secondary evidence of ownership, useful for purposes of transfer; and represent the official declaration by the corporation of what may already appear upon its books. We do not

---

[6] See *Sofie Eger*, T.C. Memo. 1966–192, wherein it was recognized that a plan under sec. 1244 must be written.

believe that the date of physical issuance of the stock certificate is controlling as to the date of issuance of the stock in ordinary corporate usage and we do not think it was intended to be controlling as to when stock is considered "issued" for purposes of section 1244.

All of the record evidence and the facts in this case, except the date of physical issuance of the stock certificate, indicate that Petroleum became a stock holder of Junction prior to the adoption of the plan on April 3, 1961. The transaction whereby Petroleum issued its check for $8,400 to meet a part of the sight draft for the equipment purchased by Junction was recorded on Petroleum's books as an investment under date of February 23, 1961, and was entered on the records of Junction as an exchange of equipment for its capital stock under the same date. This is in contradiction to the treatment accorded the check drawn by UDX to meet the sight draft on February 23, 1961, and the advance of cash by UDX to Junction on February 27, 1961, both of which were entered on Junction's books as a credit to its notes payable account.

In fact, petitioners do not deny that the $8,400 paid out by Petroleum was intended as an eventual investment in Junction; they contend only that it did not become an investment until the stock certificate was issued on May 29, 1961. Following this argument to its logical conclusion would mean that Junction had no stockholders and no capital until May 29 because no stock certificates were issued prior to that date. It would be highly unlikely that the Denver Bank would loan Junction $30,000 on April 20, 1961, if such were the fact.

We conclude that the $8,400 paid out by Petroleum on February 23, 1961, was a payment on a preincorporation subscription for 8,400 shares of the capital stock of Junction, that this subscription was accepted by Junction on March 2, when its certificate of incorporation was issued, and that Petroleum became the owner of 8,400 shares of stock of Junction on the latter date.[7] When Petroleum acquired the 8,400 shares of stock, Junction had not adopted a section 1244 plan; and the 8,400 shares of stock were not issued pursuant to a plan as required by section 1244(c).[8] It follows that the 8,400 shares of stock

[7] This conclusion also finds support in the minutes of the meeting of Apr. 3 wherein authorization was given for the original issuance of 12,000 shares, of which 2,400 were sold to Eklund and he was granted an option to purchase 1,200, leaving 8,400 unaccounted for. Par. (b) of the plan refers to stock issued during the period *Feb. 20, 1961,* to Feb. 20, 1962.

[8] We do not consider this to be inconsistent with sec. 1.1244(c)–1(c)(3), Income Tax Regs., which provides: "Stock subscribed for prior to the adoption of the plan, including stock subscribed for prior to the date the corporation comes into existence, may be considered issued pursuant to a plan adopted by the corporation if the stock is not in fact issued prior to the adoption of such plan." This obviously refers to a stock subscription conditioned upon adoption of a plan. Here, we have concluded that Petroleum's preincorporation subscription was accepted, and it became a stockholder of Junction, prior to the formulation and adoption of a plan.

did not qualify as "section 1244 stock" and petitioners are not entitled to deduct the loss suffered by Petroleum on that stock as a loss from the sale or exchange of an asset which is not a capital asset under section 1244(a).

Turning now to the $21,103 paid by Petroleum to Junction on September 26, 1961, purportedly for 21,103 shares of stock, there is no question that this payment was made after the directors of Junction had adopted a resolution to liquidate and dissolve the corporation and was made for the express purpose of permitting Junction to pay off all its creditors. After selling its equipment to Petroleum for $50,000, Junction had enough cash to pay all of its creditors in full except UDX and International, both of which Junction owed $15,000.

In his notice of deficiency respondent disallowed this deduction as a loss on section 1244 stock but allowed it as a short-term capital loss. In his amended answer, however, respondent seeks to disallow the loss entirely on the ground that the $21,103 payment in September was not a bona fide purchase of stock of Junction, but instead was a means employed to permit UDX and International to recover the money they had loaned to Junction, which Petroleum and petitioners could then recover through liquidation of those companies at capital gains rates, while creating an ordinary loss deduction for petitioners in 1961.

However laudable the motives behind this payment, it certainly does not fall within the spirit of section 1244 nor does it accomplish the purpose for which Congress enacted that section. According to the committee report, *supra*, section 1244 was designed to encourage investments in small businesses presumably to permit them to carry on their business, not to provide an ordinary loss deduction for bailing out the corporation's creditors after it had ceased doing business.

Putting aside for the moment consideration of whether this loss was the type of loss intended to be covered by section 1244, we are not convinced that the stock purportedly issued for the payment qualifies as "section 1244 stock" under the provisions of the law and the regulations.

Section 1.1244(e)–1 of the regulations requires that the corporation keep certain records, including records showing which certificates represent stock issued pursuant to the plan. No records of Junction were offered in evidence which showed any authorization for the issuance of the three certificates issued on September 26, the reason for their issuance, or whether they were issued pursuant to the plan. The rather inartfully drawn minutes of the April 3 meeting authorize the original issuance of 12,000 shares, which would be accounted for by the original 8,400 shares issued to Petroleum, the 2,400 shares purchased by Eklund, and the 1,200 shares which Eklund was given the

option to purchase at any time during the 2-year period ending April 3, 1963. However, paragraph (b) of the plan provides that all capital stock originally issued by the corporation during the 1-year period February 20, 1961, to February 20, 1962, shall be subject to the plan. Presumably the 1,200 shares optioned to Eklund would not be subject to the plan because the option was exercisable until April 3, 1963, and so far as we can tell from the record that option was still open and valid at the time the stock certificates were issued in September 1961. Technically, at least, this would seem to violate the requirement of section 1244(c) (1) (C) that at the time the plan was adopted, no portion of a prior offering (of stock) was outstanding.

Petitioners argue that the 1,200 shares was not a prior offering but was a part of the stock authorized to be issued pursuant to the plan and was offered as a part of the overall plan. But petitioners give us no reasonable explanation of how these shares could be a part of the stock offered pursuant to the plan but still be available for purchase under the option beyond the term of the plan. If we were to hazard a guess, we would surmise that the 12,000 shares were all the directors had in mind issuing under the plan on April 3, 1961, and the 2-year limit on Eklund's option was inserted to comply with section 1244 (c) (1) (A) of the Code, but when Lichtenwalter attempted to tailor the readymade plan he took from some other corporation to make it cover the 8,400 shares of stock previously sold to Petroleum, he inadvertently reduced the time within which stock could be issued pursuant to the plan to 1 year, thus probably disqualifying the 1,200 shares optioned to Eklund.

But the real basis for our conclusion on this issue is that we do not believe the $21,103 was paid for the purchase of stock of Junction. It may well have been a contribution to the capital of Junction to permit it to pay off all of its creditors, including the two corporations partially owned by Petroleum. Such altruism on the part of stockholders of a closely held corporation is not unheard of. But we will not accept the argument that it was paid for stock which was admittedly worthless at the time of issuance and which would represent an additional interest in a corporation which was insolvent and was already in the process of dissolution. The only reason this would be done would be to create a tax deduction. We cannot agree that this payment resulted in a loss on section 1244 stock, whether or not the stock purportedly issued technically qualified as section 1244 stock; and we so hold. Section 1244(d) (1) (B) provides that in computing the amount of loss for purposes of this section, any increase in basis of such stock, through contributions to the capital of such corporation or otherwise, shall be treated as allocable to stock which is not section 1244 stock. Technically, this section may not have been intended to

apply to a situation such as we have here, but we think the objective thereof lends support to our conclusion.

By amended answer respondent would have us determine that petitioners are not entitled to a deduction under any section of the Code for the loss suffered by Petroleum as a result of this payment, because the transaction was a sham designed to give petitioners a section 1244 loss deduction without actually suffering a loss. The burden of proof on this issue is on respondent. Rule 32, Tax Court Rules of Practice.

There is no evidence in the record to sustain respondent's position, except the facts that at the time the payment was made by Petroleum to Junction and was immediately used to pay off the creditors of Junction, including UDX and International, a plan of liquidation had already been adopted by International upon completion of which Petroleum received liquidating distributions of $18,462.56, and UDX was liquidated in the following year, as a result of which Petroleum received liquidating distributions totaling $143,477.40. On the other hand, Milton H. Collum, Morgan, and Lichtenwalter testified without contradiction that the stockholders of Petroleum had recognized that Junction's venture was risky and had agreed that if the venture was unsuccessful the stockholders would put up whatever additional capital was needed, in proportion to their stockholdings in Junction, to pay off all of Junction's creditors. We accept their testimony as the reason they contributed the additional capital to Junction, and find support for it in the fact that Eklund contributed his proportionate share of the additional capital needed but apparently had no interest in either UDX or International, and Petroleum and Lichtenwalter did not have the same percentage of interest in UDX and International as they had in Junction. In fact the evidence indicates that Petroleum had only a 50-percent interest in International and the other 50 percent was owned by someone who had no interest in Junction.

Respondent has failed to carry his burden of proof on the new matter raised in his amended answer and we hold against him on this issue.

Finally, petitioners argue that even if the $21,103 paid out by Petroleum to Junction in September 1961 does not qualify as an ordinary loss on section 1244 stock, nevertheless Petroleum is entitled to deduct that amount in 1961 as an ordinary and necessary business expense under section 162, on the theory that the payment was made for and was directly and closely related to the protection of the payor's reputation and credit standing, relying on cases such as *Allen* v. *Commissioner*, 283 F. 2d 785, and *Dunn & McCarthy* v. *Commissioner*, 139 F. 2d 242. While there is some vague testimony that the creditors of Junction were firms with which the individual petitioners and

Petroleum did business, there is no convincing evidence of how the failure of Junction to pay all of these creditors would have affected the businesses of petitioners and Petroleum. It is also clear that without these additional contributions of capital by its stockholders Junction could have paid off all its creditors except UDX and International. There is not only a lack of evidence as to what business petitioners, individually, and Petroleum might have had with these corporations but it is also true that Petroleum owned about 96 percent of UDX and about 50 percent of International and the evidence indicates that petitioners and their associates controlled these two corporations.

Petitioners' contention is too far fetched to be convincing and we hold that this payment by Petroleum was not deductible under section 162.

Our final conclusion is that respondent's determinations with respect to these payments in his notices of deficiency were correct. Petitioners having conceded all other adjustments made by respondent in his notices of deficiency, we find that the deficiencies determined by respondent in the notices of deficiency sent to each of the taxpayers here involved were correct. Hence,

*Decisions will be entered for respondent in each of the docket numbers.*