Homer L. BRUCE, Jr. and wife, Constance H. Bruce, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 66-H-285.

United States District Court
S. D. Texas,
Houston Division.

Nov. 21, 1967.

Baker, Botts, Shepherd & Coates, Wm. C. Griffith, Houston, Tex., for plaintiffs.

Frank C. Cooksey, Asst. U. S. Atty., Houston, Tex., and Leonard B. Tatar, Atty., Tax Div., Dept. of Justice, Fort Worth, Tex., for defendant.

CONNALLY, Chief Judge.

MEMORANDUM:

The plaintiffs, Homer L. Bruce, Jr. and wife, seek to recover $16,633.49 in federal income taxes paid for the year 1962. In issue is the character of loss—whether capital or ordinary—sustained by plaintiff when stock owned by him in HLB Corporation became worthless during the tax year. The case was submitted largely on stipulated facts and documentary evidence, the only oral testimony being that of the plaintiff.

HLB Corporation was organized in 1960 under the Texas Business Corporation Act. Its authorized capital stock was 10,000 shares of common stock at a par value of $5.00 per share. Plaintiff subscribed to 200 shares of this stock, paid $1,000.00 therefor, and became the sole shareholder. He remained the sole shareholder and dominant figure throughout the life of the corporation. At all material times HLB qualified as a small business corporation under § 1244 of Title 26 U.S.C.A.

On May 16, 1960, the organizational meeting of the board of directors was held. The minutes of that meeting contain a recitation acknowledging receipt of the $1,000.00 from Bruce and set forth the following resolution:

"RESOLVED, that the President and Secretary of the company be and they are hereby authorized to issue the following certificates, representing shares of stock in the company:

Homer L. Bruce, Jr. 200 shares."

Thereafter, in August of 1960, HLB acquired an undivided fifty per cent interest in a producing oil and gas lease. In hopes of increasing production in the field, HLB instituted a secondary recovery program, whereby air was injected into the reservoir to increase the pressure therein. The project met with early success and several dormant wells began producing again.

A second meeting of the board of directors was held September 12, 1960 and a resolution adopted authorizing the issuance of an additional 1,300 shares of stock to Bruce. The minutes of the meeting set forth the resolution as follows:

"BE IT FURTHER RESOLVED that the President and Assistant-Secretary be and they are hereby authorized to issue 1,300 shares of the company's capital stock to Homer L. Bruce, Jr., in consideration of the cancellation of $6,500.00 in advances made by Mr. Bruce to the company, * * *."

HLB continued its secondary recovery program, but the initial success was short lived, and production failed to meet the projected rate. Throughout the first year of operations, HLB's expenses consistently exceeded gross income. During this period, Bruce made a series of short-term advances to HLB. On October 5, 1961, the board of directors authorized the issuance of further shares in the company to Bruce, as reflected in the following resolution:

"RESOLVED that the President and Assistant Secretary be and they are hereby authorized to issue 2002 shares of the company's capital stock to Homer L. Bruce, Jr., in consideration of the cancellation by Mr. Bruce of the promissory note of the company

dated January 27, 1961, for $3185.00 and the cancellation of the company's note dated May 29, 1961, for $6825.00."

In the next year of operation it became apparent that heavy additional investments would be required if the secondary recovery program was to continue. The interested parties, including HLB, decided to sell the lease, and on November 9, 1962, the board of directors of HLB authorized its President (Bruce) to sell the lease.

Next occurred a series of events which led to the dissolution of HLB. On November 26, 1962, the board of directors adopted the following "plan" for offering 8,400 shares of stock for purchase:

> "RESOLVED that the President of the Company be and he is hereby authorized to offer, as soon as the Articles of Incorporation of the Company have been amended so as to provide for a total authorized capital stock of the Company of 15,000 shares of a par value of $5.00 per share, for a period ending December 12, 1962, 8,400 shares of the stock of the Company of a par value of $5.00 per share to such parties as he may deem advisable, for purchase at the par value of $5.00 per share, in cash."

A purchaser having been found for the oil and gas lease, on December 7, 1962, HLB delivered title to the buyer and ceased the active conduct of business.

Bruce subscribed to, and paid $42,000.-00 in cash for, the 8,400 new shares of HLB on December 10, 1962. The company then liquidated its other assets and proceeded to discharge its liabilities, including a $50,298.17 indebtedness to Bruce. The articles of dissolution of HLB were filed with the Secretary of State on December 18, 1962, and a remaining cash balance of $6,306.71 was distributed to Bruce in liquidation of all his stock.

Section 1244 of the Internal Revenue Code, Title 26 U.S.C.[1], makes provision for ordinary loss treatment by shareholders in a small business corporation when their stock becomes worthless. In order to qualify as "Section 1244" stock, certain specific requirements must be met. In general, to qualify, the stock must be common stock in a domestic small business corporation which adopts a plan to offer such stock for a period (not exceeding two years) specified in the plan. At the time the plan is adopted, no portion of a prior offering may be outstanding; and the stock must be issued, pursuant to the plan, for money or other property (excluding stocks and securities).[2] By regulation, the plan must be in writing, and the stock must be issued during the period of the offer. Treasury Regulations on Income Tax (26 C.F.R.), §§ 1.1244(c)–1(c) (1) and 1.244 (c)–1(c) (2).

The government takes the position that none of Bruce's stock in HLB qualifies as "Section 1244 stock", while the plaintiff insists that all of it qualifies. To determine the controversy, each issue of stock must be examined separately.

---

1. SEC. 1244. LOSSES ON SMALL BUSINESS STOCK. (a) General Rule.—In the case of an individual, a loss on section 1244 stock issued to such indiv'dual or to a partnership which would (but for this section) be treated as a loss from the sale or exchange of a capital asset shall, to the extent provided in this section, be treated as a loss from the sale or exchange of an asset which is not a capital asset.

2. Section 1244(c) provides in part:
"(1) In General—For purposes of this section, the term "section 1244 stock" means common stock in a domestic corporation if—

(A) such corporation adopted a plan after June 30, 1958, to offer such stock for a period (ending not later than two years after the date such plan was adopted) specified in the plan,
(B) at the time such plan was adopted, such corporation was a small business corporation,
(C) at the time such plan was adopted, no portion of a prior offering was outstanding,
(D) such stock was issued by such corporation, pursuant to such plan, for money or other property (other than stock and securities), * * *."

██ Plaintiff admits that no formal plan, as such, was in existence at the time the original 200 shares were issued to him. However, he contends that the resolution of the board of directors adopted May 16, 1960, supra, satisfies the requirement that the stock be issued pursuant to a *written* "plan", citing Rev. Rul. 66–67, 1966–1 Cum.Bull. 191. Accepting the position that no separate written or formal plan is required, and that the minutes of a Directors meeting may suffice if the statutory requirements are met, nevertheless, the stock will not qualify. Although plaintiff received his share certificates after the resolution "plan" was adopted, the stock must be considered as issued, and the plaintiff considered a stockholder, at the time he subscribed to and paid for the stock. Payment having been made by Bruce prior to the first meeting of the board of directors, the stock was effectively issued before a plan was adopted, and could not, therefore, have been issued pursuant to it, as required by the statute. See, Lichtenberg v. Commissioner, P–H Memo T.C., par. 67,130 (June 14, 1967) and Morgan v. Commissioner, 46 T.C. 878 (1966).

█ Plaintiff's second and third stock acquisitions may be considered together. Again, there is no contention that formal written plans existed with respect to these issues. Plaintiff points to the resolutions of September 12, 1960, and October 5, 1961 (both set out in full above), as constituting the requisite plans. Neither of these resolutions will suffice, however, because the period during which the stock was to be offered is not specified in either "plan". There is nothing in either resolution that would require the issuance of the stock within two years from the date of adoption, an express prerequisite under Section 1244. Warner v. Commissioner, 48 T.C. 49 (1967).

The final stock issue presents quite a different question. Apparently having consulted tax counsel in the interval,[3] the minutes of the Directors meeting of November 26, 1962 now refer specifically to a "plan" for offering the additional shares, and the resolution fixes the period (ending December 12, 1962) within which it was to be offered. Thus the earlier deficiencies were corrected. The government argues, nevertheless, that the transaction was lacking in economic substance and should be disregarded for purposes of determining whether the shares qualify as "Section 1244 stock".

As mentioned, the company was in the process of dissolution when this block of shares was issued. As Bruce was the president and sole shareholder in HLB, it is beyond question that the transaction was not an ordinary corporate investment. Plaintiff does not contend to the contrary, but argues that as there was literal and technical compliance with the statutory requirements, he should have the advantages thereof.

██ In my judgment, the acquisition of the 8,400 shares by Bruce was not a bona fide purchase of the stock of HLB. The entire transaction consisted of Bruce taking the money from his own pocket, running it through the bank account of HLB, and then repaying these funds to himself in satisfaction of what otherwise would have been a bad debt. Whatever the character of the payment— whether it be considered a contribution to capital or otherwise—or the motives of the plaintiff in making it, the transaction does not come within the spirit of Section 1244. Obviously, the section was enacted to encourage legitimate and bona fide investments in small businesses, not to create ordinary loss bail-out deductions for creditors of an insolvent company. Lichtenberg v. Commissioner, supra; Morgan v. Commissioner, supra.

3. It would seem unlikely that plaintiff was aware of the advantages which Section 1244 offered him, in event his investment in HLB proved unprofitable, prior to this time. Had he been aware, he could with little difficulty have avoided the questions of non-compliance which the government raises. I think this is immaterial, however, for, if in fact there is compliance with the statute, I believe plaintiff would be entitled to the advantages thereof whether such compliance be deliberate or merely fortuitous.

Plaintiff, therefore, is not entitled to Section 1244 treatment on any of his stock in HLB. As to the first three acquisitions at least, this result is perhaps unfortunate. Apparently it was this sort of investment which Congress intended to encourage by enacting Section 1244. However, when such a tax benefit is provided, it is encumbent upon those seeking to take advantage of it to satisfy all the specific prerequisites necessary to bring themselves within the coverage of the statute. In this the plaintiff has failed.

The foregoing is adopted as Findings of Fact and Conclusions of Law. Counsel for defendant will prepare an appropriate form of judgment, submit same to opposing counsel for approval as to form, and forward same to the Court for entry.