Roland E. Scott and Helen M. Scott v. Commissioner.
Scott v. Commissioner
Docket No. 3422-66.
United States Tax Court
T.C. Memo 1968-148; 1968 Tax Ct. Memo LEXIS 151; 27 T.C.M. (CCH) 735; T.C.M. (RIA) 68148; July 15, 1968, Filed Robert D. Wenzel, 111 W. St. John, San Jose, Calif., for the petitioners. Joseph Nadel, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined a deficiency of $11,159.19 in petitioners' income tax for the year 1962. The taxable income of petitioners was adjusted by increasing gross income $1,327.44 and by disallowing an interest expense of $123.68, a medical expense of $180.79, and an ordinary loss on the sale of stock of $26,200. [1] An additional capital loss of $1,000 was allowed. The parties have stipulated the correctness of the addition to income and the disallowance of the interest expense. The amount of medical expenses allowable as a deduction depends upon petitioners' adjusted gross income which, in turn, depends upon the amount of business expenses incurred by them during 1962. Therefore, the sole remaining issue for decision is whether a $26,240 loss on the sale of stock owned by Roland E. Scott constituted an ordinary loss under *153 section 1244(a), Internal Revenue Code of 1954, [2] or a capital loss under either section 1244(d) (1)(A) or section 1201. Findings of Fact Most of the facts have been stipulated and are found accordingly. Roland E. Scott (herein called petitioner) and Helen M. Scott, husband and wife, were residents of San Jose, California, at the time they filed their petition in this proceeding. They filed a joint Federal income tax return for the calendar year 1962 with the district director of internal revenue at San Francisco, California. Petitioner and another person designed a unique and relatively inexpensive diving board constructed of extruded aluminum with a baked enamel finish. In order to exploit the invention, petitioner organized the Alumiboard Corporation (herein called Alumiboard), for which articles of incorporation were filed with the California secretary of state on February 6, 1962. The first board of directors meeting of Alumiboard was held on February 9, 1962, at *154 the law offices of A. D. McNeil (herein called McNeil) and Robert D. Wenzel (herein called Wenzel) in San Francisco, California. Present at the meeting were petitioner, McNeil and Wenzel. Provisions were made for the adoption of by-laws, but none were recorded in the minutes as having been passed. The following officers were elected: Ronald Cook, president; A. D. McNeil, vice president; and petitioner, secretary-treasurer. 736 Petitioner was the administrative officer of Alumiboard and ran its affairs from a room in his home. During the corporation's existence he advanced $26,740 to it as its sole source of capital. Petitioner personally guaranteed all loans made to Alumiboard and through August 1, 1962, devoted all of his working time to the corporation. Alumiboard began to sell diving boards through a distributor in the early spring of 1962. Within a short time, however, difficulties were encountered with the enamel finish of the board. Anticipating the development of a more acceptable board, the distributor terminated its contract with Alumiboard. All sales had ceased by September 1962. As of December 1, 1962, Alumiboard had very few assets, consisting of a small stock of *155 diving boards, and liabilities totaling between $6,000 and $8,000. On December 11, 1962, the "board of directors" of Alumiboard met for the second and final time in a special meeting called to "make plans as to what should be done with [the] entire operation." At that time, a patent application had been filed on the aluminum diving board, and Alumiboard had been contacted by two or three other distributors. Petitioners Roland E. and Helen M. Scott and Wenzel attended the meeting. It was announced that Ronald Cook and McNeil had resigned as officers. Petitioner was then elected president, Helen M. Scott was elected vice president, and Wenzel was elected secretary-treasurer. E. Day Carman, a partner in the new law firm with which Wenzel was associated, and Helen M. Scott were appointed as directors. The following additional entries were made in the official minutes of the meeting: The President then declared that the next order of business was the authorization and direction that the President and Secretary prepare, execute and verify an application for the issuance of stock in this Corporation to Mr. R. E. Scott in cancellation of indebtedness pursuant to a plan whereby the Corporation *156 would qualify under Section 1244 of the Internal Revenue Code as a Small Business Corporation. Thereupon, the following preamble and resolutions were offered and their adoption duly moved and seconded. Whereas, this Corporation has an authorized capital stock of 20,000 shares of stock of one class, each having a par value of $10.00, and no shares have been issued. IT IS THEREFORE RESOLVED: 1. The President and Secretary are hereby authorized and directed to prepare and file a verified application with the California Commissioner of Corporations for a permit authorizing the Corporation to issue, not to exceed, Two Thousand, Six Hundred and Seventy-Four (2,674) shares of its common stock, each having a par value of $10.00, to R. E. Scott in cancellation of indebtedness of this Corporation to Mr. R. E. Scott in the sum of $26,740.00. 2. It is the intent of the Board of Directors that this Corporation shall qualify as a Small Business Corporation under existing provisions of the Internal Revenue Code of 1954, Section 1244, or under any subsequent section(s) which may replace or amend said Section, and in particular, specifically *157 declare it to be the plan of this Corporation that the securities to be issued under the permit herein authorized shall not be issued later than two (2) years from the date hereof, nor shall they be issued for a consideration in excess of $10.00 per share. 3. Upon receiving a permit from the Commissioner of Corporations, the President and Secretary, or Vice-President, are hereby authorized and directed to issue Two Thousand, Six Hundred and Seventy-Four (2,674) shares of this Corporation's stock to R. E. Scott, for the consideration stated, and in compliance with the terms and conditions of the permit of the Commissioner of Corporations, and with these resolutions. 4. The designated officers are hereby authorized and directed to execute all necessary documents and to take such necessary action as may be required to carry out and perform the purposes of these resolutions. 5. E. Day Carman, Attorney at Law, 777 North First Street, San Jose, California, is hereby appointed as Escrow Holder to receive and hold the shares of stock to be issued by this Corporation. At the meeting on December 11, 1962, petitioner and Wenzel agreed that after the Alumiboard stock was issued to petitioner, *158 it would be sold immediately to Wenzel. After the meeting, the following events occurred in rapid succession. On December 19, 1962, the California Corporations Commissioner authorized the issuance of 2,674 shares of stock by Alumiboard. On December 21, 1962, Alumiboard issued 2,674 shares of stock to petitioner "in cancellation of its indebtedness to [him]." On December 28, 1962, petitioner sold the entire 737 issue of stock to Wenzel for $500, which was the fair market value of the stock at that time. After this time, Alumiboard Corporation did not conduct any corporate activities. In his Federal income tax return for 1962, petitioner reported total income of $7,050 from Alumiboard, consisting of $1,050 in salary, $300 in interest payments and $5,700 in royalty payments (even though at that time no patent had been issued for the aluminum diving board). He claimed an ordinary loss of $26,200 on the sale of his shares of Alumiboard stock. Opinion Respondent contends that the plan to issue section 1244 stock was without substance and should be given no tax effect. As a result, it is argued, the loss claimed by petitioner should be treated as one arising out of the sale *159 or exchange of a capital asset. Alternatively, he argues that if the issuance of stock qualified under section 1244, the entire loss would nevertheless be treated as capital in nature as a result of section 1244(d)(1)(A), which provides that in determining the amount of ordinary loss the basis of property exchanged for section 1244 stock must be reduced by an amount equal to the excess, at the time of the exchange, of the adjusted basis of the property over its fair market value. Petitioner contends that since respondent failed to question specifically the bona fides of the plan in the notice of deficiency or in the answer, the matter is not at issue in this case. In addition, he contends that section 1244(d)(1)(A) does not apply "when cash is transferred to the corporation creating an indebtedness of the corporation which is later extinguished by the issuance of stock." In our opinion neither party has accurately characterized the operative legal relationships involved herein. Both have assumed in their arguments that the advances made by petitioner to Alumiboard created an indebtedness of the corporation to him. We think it is clear that his advances constituted equity investments *160 in the nature of stock subscriptions. Petitioner was the prime mover in the corporate venture. His cash advances to Alumiboard constituted its sole source of capital, and through the short period of its effective life he devoted his entire working time to its management. As the Court of Appeals said in United States v. Title Guarantee & Trust Co., 133 F. 2d 990, 993 (C.A. 6, 1943): The essential difference between a stockholder and a creditor is that the stockholder's intention is to embark upon the corporate adventure, taking the risks of loss attendant upon it, so that he may enjoy the chances of profit. The creditor, on the other hand, does not intend to take such risks so far as they may be avoided, but merely to lend his capital to others who do intend to take them. Neither notes nor shares of stock were issued by Alumiboard in exchange for petitioner's cash advances. Through September 1962, when all sales of the corporation ceased, Alumiboard had not issued a single share of stock, nor was the adoption of a section 1244 plan contemplated. Unquestionably, however, petitioner became a shareholder of Alumiboard at the time of his first advance to it. As we said *161 in Wesley H. Morgan, 46 T.C. 878, 890 (1966): Generally, the issuance of a certificate is not necessary to constitute one a stockholder. Also, the date of delivery of the certificate is not controlling as to the date a subscriber becomes a stockholder. The stock certificate is merely the documentary evidence of membership in a corporate organization and an attestation of the stock-holder's ownership of shares of interest therein. It follows, therefore, that the 2,674 shares of stock were effectively issued before a plan was adopted and could not have been issued pursuant to it. [3]Wesley H. Morgan, supra; Bruce v. United States, 279 F. Supp. 686 (S.D. Tex. 1967). Consequently, petitioner's loss on the sale of the Alumiboard stock was one arising from the sale of a capital asset as defined in section 1221. If we were to accept the parties' characterization of the obligation between Alumiboard and petitioner as an indebtedness, our conclusion *162 would be the same. The plan purporting to comply with the provisions of section 1244 was without substance. We reject petitioner's contention that the bona fides of the plan are not at issue. Respondent first specifically raised the issue in his opening statement. Petitioners did not allege surprise at that time, nor do they make such a claim now. As a matter of fact, petitioner was sworn as a witness in his own behalf for the announced purpose of answering respondent's allegation that 738 the plan was without substance. [4] The trial proceeded on the assumption that this was an issue and both parties discussed the issue in their briefs. We conclude that this issue is properly before us. Prather v. Commissioner, 322 F. 2d 931 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court; Arthur C. Ruge, 26 T.C. 138 (1956). *163 As of the date the "plan" was adopted, Alumiboard was insolvent, it had practically no assets, and its sole product was unmarketable, as reflected by the cessation of all sales. Since at that time the petitioner had no patent on the diving board, other more acceptable products were moving into the market. Future successful operations, even if a patent was obtained, were very problematical. It is obvious from all the facts in this record that adoption of the "plan" and issuance of the stock to petitioner were merely paper transactions designed to create an ordinary loss bail-out deduction for an economic loss that had already been suffered. Such transactions do not fall within the purview of section 1244. [5]Bruce v. United States, supra; Wesley H. Morgan, supra.
*164 Accordingly, we hold that petitioners are not entitled to any ordinary loss deduction on the sale of the Alumiboard stock. Decision will be entered under Rule 50. Footnotes
1. The parties now agree that the loss incurred on the sale of stock was $26,240. ↩
2. All statutory references herein are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
3. As to the inapplicability of (C)-1 (C)-1 section 1.1244 (c)-1(c)(3), Income Tax Regs., see Wesley H. Morgan [Dec. 28,131], 46 T.C. 878↩ (1966), footnote 8, page 891.
4. At trial, petitioner's attorney, Robert D. Wenzel, made the following remarks in his opening statement: I would say we have a stipulation. Since that time I have analyzed our burden of proof and I think there are a few things that your Honor may want to have evidence on that we do not have in the stipulation. If we in fact have an admission from counsel that the stock does qualify as 1244 stock, then I don't believe there is anything that we would need evidence on, your Honor. Respondent's counsel replied in his opening statement: It is the Respondent's contention that at the time of the alleged plan to issue section 1244 stock the corporation for any business purpose had really ceased to exist. Thus, it is the Respondent's position that this alleged plan to issue section 1244 stock was in fact a device used to realize an ordinary loss, to realize, rather, as an ordinary loss an economic loss that had already been suffered. Roland E. Scott was then called as the only witness.↩
5. We do not reach the issue vigorously pressed by both parties, i.e., whether section 1244(d) (1)(A) applies to the exchange of a valid indebtedness for section 1244 stock. We note that while Rev. Rul. 66-293, 1966-2 C.B. 305, STANDS FOR THE PROPOSITION THAT SECTION 1244(D)(1)(A)↩ does apply to such an exchange, there is no supportive case law. Thus adjudication of this question can await a future day in a factual situation which squarely presents it.