WILLIAM F. WALLACE, SR., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 186–69. Filed June 23, 1971.

*Robert Burke*, for the petitioner.
*Harold Friedman*, for the respondent.

SIMPSON, *Judge:* The respondent determined deficiencies in the income tax of the petitioner of $52,192.30 for 1964 and $2,594.25 for 1965. The issue for decision is whether the petitioner is entitled to deduct certain amounts paid to settle the liability of himself and his younger son with respect to lawsuits brought against them by the petitioner's elder son, and amounts paid for related legal services, as ordinary and necessary business expenses, or as ordinary and necessary expenses incurred for the production of income, or as expenses for the management, conservation, or maintenance of property held for the production of income.

FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

For the taxable years 1964 and 1965, the petitioner, William F. Wallace, Sr., filed individual Federal income tax returns with the district director of internal revenue, Austin, Tex. He maintained his residence in Corpus Christi, Tex., at the time the petition was filed in this case.

From 1917 until April 1964, the petitioner was married to Mary Ethyl Pope Wallace (Mrs. Wallace). Their marriage was terminated by divorce. Three children were born of that marriage: William F. Wallace, Jr. (William, Jr.); Robert P. Wallace (Robert); and Dorothy Wallace Putnam.

During the years in issue, and for a number of years prior thereto, the petitioner was the president and a shareholder of the United Savings Association (the association) of Corpus Christi, Tex. He was also a principal founder and organizer of the association, which was organized in 1949. In addition, he controlled three banks prior to the divorce settlement.

Each depositor in the association was entitled to certain voting rights in corporate affairs. However, the signature card that a depositor was required to sign when opening his account contained language to the effect that he designated certain individuals, identified by either name or title, as those entitled to vote as his proxy at any meeting of the association at which he was not personally present. The original signature card named the petitioner as the person entitled to exercise such voting power as proxy, and stated that should the petitioner be unable to so act, the secretary of the corporation would succeed to such power. Robert has at all times been the secretary of the association, and at some time, the signature card was modified to designate Robert by name as the person to act as proxy for the depositor in the event of the petitioner's inability to do so. The petitioner might not be able to control and dominate the business affairs of the association solely by virtue of the stock owned by himself and his family; such control and domination was virtually assured by his being designated as proxy by the depositors of the association.

Both of the petitioner's sons were attorneys; William, Jr., the elder son, was admitted to the bar in 1941, and Robert, in 1948. William, Jr., acted as the attorney for the association; he performed legal services incident to its formation. He drew up all of the required papers, including the original signature card containing the proxy designations. He knew of the decision, made by the petitioner, that

Robert should occupy the office of secretary of the corporation; William, Jr., offered no objection to such decision at that time.

The petitioner and all three of his children were among the original subscribers to stock in the association. However, of the children, only William, Jr., did not receive the shares for which he had subscribed, because he failed to make the required payment therefor. Robert signed a note payable to the petitioner, on the basis of which the petitioner paid for the stock for which Robert subscribed; a similar offer was made to William, Jr., but he would not sign such a note to the petitioner. William, Jr., did subsequently obtain stock in the association; he purchased a small number of shares from a friend, and later on, in 1959, the petitioner and his wife gave 500 shares of stock to each of their children, including William, Jr.

The Wallace Insurance Agency (W.I.A.) is an insurance agency owned in equal shares by the petitioner's three children. Representatives of the association sometimes recommended to borrowers that they place their hazard insurance with W.I.A. Also, W.I.A. handled the insurance that the association needed for itself. William, Jr., received income as an insurance agent through his interest in W.I.A.

There were strains in the relationship between William, Jr., and the petitioner. For example, there was a dispute between them with respect to a bill for legal services rendered by William, Jr., in connection with obtaining the corporate charter for the association. Subsequently, William, Jr., refused to pay, by note or otherwise, for the association stock for which he had subscribed. Also, William, Jr., made certain demands with respect to the insurance business of W.I.A. which his father considered unreasonable and embarrassing, and there was "considerable argument" between them about William, Jr.'s other legal fees charged for the association's business.

Such disagreements reached a climax on or about March 15, 1960, when William, Jr., visited the petitioner's home, at a time when the petitioner was there alone, and threatened to kill the petitioner and Robert if the petitioner did not accede to certain demands. William, Jr., demanded that he be made the vice president, secretary, and a director, of the association, and that notice of such actions be placed on the front page of the local daily newspaper the next day.

After such threats were made, the petitioner had a conference which included Robert, the family physician, and three attorneys. One of the attorneys, Charles Lyman, agreed to represent the petitioner, Robert, and the association in connection with the demands made by William, Jr. Upon Mr. Lyman's advice, on March 26, 1960, the petitioner swore out a complaint against William, Jr., on the basis of his threat. The immediate result of such action was that William, Jr.,

was put in jail, where he remained until his release was obtained on a peace bond.

On March 28, 1960, the petitioner filed actions in the County Court of Nueces County, Tex., to have William, Jr., declared to be of unsound mind, to have a guardian appointed for him, and to have him hospitalized as a mentally ill person. William, Jr., traveled to Philadelphia to be examined by psychiatrists, and as a result of the psychiatrists' report, the County Court found that William, Jr., was of sound mind, was not mentally ill, was not in need of the appointment of a guardian, and that the proceeding initiated by the petitioner should be dismissed.

On May 2, 1960, William, Jr., filed suit (the 1960 suit) in the District Court of Nueces County, Tex., against the petitioner, Robert, and the association. William, Jr., alleged that he had subscribed to 150 shares of stock in the association at the time that corporation was being established, including a subscription for 50 shares in the name of his wife, the rights to which subscription he said he acquired by virtue of a property settlement. He stated that he endorsed such subscriptions over to the petitioner with the agreement and understanding that the petitioner would hold the stock on behalf of William, Jr., with the latter retaining the beneficial and equitable ownership of it. According to the alleged agreement, the petitioner was to finance the purchase of William, Jr.'s stock at a prime rate of interest, and any cash dividends paid on such stock were to be applied first to the interest and carrying charges due on the loan, and then to the principal balance of the obligation. The petitioner was to hold the stock for William, Jr., until the cash dividends fully paid off the cost of the stock, or until William, Jr., demanded the stock and tendered the balance of the purchase price still due and owing to the petitioner, whichever event occurred first. William, Jr., further alleged that the cash dividends had more than paid for the interest and carrying charges on the loan, and that the excess amount of the cash dividends should be applied toward the principal of the purchase price; furthermore, William, Jr., indicated he had in the past been willing, and was still willing, to make whatever payment he might still owe the petitioner in order to be entitled to have such stock transferred to him. However, according to the petition in that suit, his 150 original shares of stock had increased, by virtue of stock dividends, stock splits, and stock options (all of which the petitioner was alleged to have exercised with respect to this stock), to 4,716 shares out of the 55,000 shares issued and outstanding. William, Jr.'s petition indicated that he valued the stock at $280,000. In addition, he sought exemplary

damages in the amount of $100,000 against the petitioner, alleging that the petitioner had acted maliciously and with harmful intent in failing to deliver the stock upon the demand of William, Jr.

Against Robert, William, Jr., alleged that his brother had pursued a course of conduct calculated and intended to interfere with, not only the relationship between William, Jr., and the petitioner, but also with the agreements existing between them, so that William, Jr., would be deprived of his association stock and the value of his agreements with the petitioner. William, Jr., sought from his brother the sums of $100,000 in actual damages and $100,000 in exemplary damages.

William, Jr., sought no money damages from the association; he simply sought to enjoin it and restrain it from transferring any stock held in the names of the petitioner and Robert on its corporate records. William, Jr., expressed the fear that his father and brother would endeavor to hide, secrete, or transfer their shares.

The petitioner, by his attorneys Lyman & Sudduth, filed an answer in which he denied all of William, Jr.'s allegations, and challenged him to prove the truth of each of them.

William, Jr., amended his petition in the 1960 suit three times, and the final amended version thereof, filed April 17, 1964, contained increased claims and more specific allegations. It alleged that the number of shares of stock of the class allegedly owned by William, Jr., had been increased to 60,000 shares issued and outstanding, and as a result, William, Jr., was now entitled to 5,160 shares. It also alleged, as part of the agreement between the petitioner and William, Jr., that the petitioner was to exercise his controlling interest in the association for the mutual benefit of himself and William, Jr., and the latter was to be designated as the substitute in the signature card proxy agreement so that he would succeed to the control of the corporation in the event of his father's retirement, death, or incapacity. It had also been agreed, according to William, Jr.'s amended petition, that the petitioner would retire from his position with the association in or about 1959, when he reached the age of 70.

William, Jr., further alleged that he had initially been named as the successor to his father in the signature card proxy agreements, that such agreements were changed to name the secretary of the corporation as the successor, and that Robert occupied the office of secretary as the nominee of William, Jr. He alleged that Robert had been his employee at the time Robert was placed on the board of directors of the association and made secretary "temporarily," and that there was a clear understanding between them that he, William, Jr., would assume the duties of director and secretary as soon as his affairs would permit. He charged that Robert, by breaching a tripartite

agreement between the two sons and their father, had wrongfully deprived him, William, Jr., of the "right of succession to control" of the association, and that such right made a very substantial difference in the market value of the stock of the person who held that right. He indicated that his demand to be placed in the position of secretary, among other offices, was based primarily on his desire to succeed to the control of the association by being designated as the substitute recipient of the proxy power. He indicated that his oral demands of his father, made concurrently with the treat to kill, asked only what he, William, Jr., was entitled to under his agreement with his father.

The amended petition claimed that the 5,160 shares of stock had a value in themselves of $309,600; moveover, William, Jr., alleged that his rights to control the association or to succeed to its control by the proxy designation were worth an additional $397,800, and that Robert had unjustly enriched himself and increased the actual market value of his stock by that amount. The demand for the delivery of the 5,160 shares of stock was directed only at the petitioner; the demand for restitution of the alleged right to participate in and succeed to control of the association was directed at the petitioner and Robert jointly. William, Jr., requested in the amended petition that if the court was unable to restore his stock and place him in the position of control to which he claimed entitlement, then he should receive in the alternative the sum of $707,400 for actual damages arising out of the loss of such stock and power.

On March 20, 1962, William, Jr., filed suit (the 1962 suit) in the District Court of Nueces County, Tex., against the petitioner and Robert. In the 1962 suit, William, Jr., sought damages as a result of his imprisonment in 1960 at the instance of the petitioner, and as a result of the petitioner's actions challenging William, Jr.'s mental competency and asking to have a guardian appointed for his estate. William, Jr., charged that the petitioner had taken such actions on behalf of both himself and Robert. He claimed $250,000 in damages for the confinement and the proceedings with respect to the charges of mental incompetency, alleging that his professional practice had been harmed, and asked an additional reimbursement in the amount of $21,659.10 for his expenses in securing legal and medical services and in traveling to the sites of the psychiatric examinations. In addition, he alleged that because of the malicious attitude underlying the defendants' actions, he was entitled to an additional $100,000 in punitive damages. Thus, the total sum of money sought in the 1962 suit was $371,659.10.

Both defendants, acting through their attorneys Lyman & Sudduth, denied William, Jr.'s allegations in that suit, and challenged him to prove his charges.

Meanwhile, on October 3, 1960, the petitioner's wife filed suit against him for divorce in the Court of Domestic Relations of Nueces County.

On March 26, 1964, an agreement (the March 1964 agreement) was entered into among the petitioner, Mrs. Wallace, William, Jr., Robert, and the association. Such agreement was to take effect in the event that the petitioner and Mrs. Wallace could agree on a settlement of their community property, and that the Court of Domestic Relations of Nueces County would grant the divorce and approve such property settlement, within 30 days. The March 1964 agreement provided that the community property should be divided equally between the petitioner and Mrs. Wallace, but that the petitioner would pay $100,000 out of his one-half share to Mrs. Wallace, and that Mrs. Wallace would also receive two obligations of William, Jr., to the community, in the amounts of $19,000 and $10,000, without having the amounts of such obligations charged against her one-half share of the community division. In consideration for the $100,000 and the obligations of William, Jr., Mrs. Wallace was required to assume all liability under William, Jr.'s claims against the petitioner, Robert, and the association in the 1960 and 1962 suits. Mrs. Wallace agreed to indemnify and hold harmless those parties defendant from all liability arising out of those two suits. However, her obligation specifically did not include any liability for attorneys' fees in connection with those suits; such matter was reserved for disposition in the property settlement agreement which was to follow. William, Jr., agreed to dismiss his father and brother and the association as parties defendant in the 1960 and 1962 suits, and Mrs. Wallace agreed to enter her appearance in each of those suits as defendant. There was no allocation of the $100,000 consideration whatsoever, as between the 1960 suit and the 1962 suit, or as between the various claims made therein.

On April 25, 1964, the petitioner and Mrs. Wallace entered into a property settlement agreement (the property settlement agreement), and on the same day, the Court of Domestic Relations granted Mrs. Wallace a divorce from the petitioner and approved the property settlement agreement. The property settlement agreement listed, as an indebtedness of the community, an obligation to the law firm of Lyman & Sudduth in an amount not to exceed $15,000. The cash owned by the community, including that held in all of their investment share accounts and savings accounts, was to be equally divided between the petitioner and Mrs. Wallace, except that it was specifically provided that Mrs. Wallace should receive less cash than the petitioner by a sum equal to one-half of the indebtedness to Lyman & Sudduth, such sum to be limited to $7,500. However, Mrs. Wallace was then to be

held harmless from any liability for such indebtedness, which would be assumed by the petitioner.

The property settlement agreement further provided that the petitioner, by complying with its terms, should be deemed to have discharged all of his liability to Mrs. Wallace under the March 1964 agreement. Also, the property settlement agreement reiterated Mrs. Wallace's agreement to assume all liability arising from William, Jr.'s claims against the petitioner, Robert, and the association in the 1960 and 1962 suits.

On April 25, 1964, Mrs. Wallace did have herself substituted as the sole party defendant in the 1960 and 1962 suits, and on the same day, William, Jr., fully released and discharged the petitioner, Robert, and the association from the claims asserted in, and liabilities arising from, those suits.

On May 12, 1964, the Nueces County District Court entered judgments in the 1960 and 1962 suits, with Mrs. Wallace as the only defendant in both. In the 1960 suit, the court's judgment was that the petitioner had made a valid and binding agreement to hold in trust for William, Jr., the association stock for which he subscribed, along with the stock dividends, stock splits, and stock options related to such stock. The court also found that on March 15, 1960, William, Jr., tendered payment of the balance due on the purchase price of such stock to his father and demanded his father perform in accordance with the agreement, and that his father refused. The judgment stated that William, Jr., was entitled to 5,160 shares of stock in the association, and the value of such stock was placed at $100 per share when part of a controlling interest in the corporation. It provided that William, Jr., should recover such stock from his mother, but permitted the mother to substitute other assets "of like type and value affording like privileges." However, the judgment also stated that William, Jr., owed the petitioner the sum of $20,930 as the balance due on the agreement made between them whereby the petitioner agreed to hold the association stock in trust for his elder son.

In the 1962 suit, the judgment stated that the court found that William, Jr.'s confinement in March 1960 was illegal and without probable cause, that it was brought about by the petitioner and Robert, and that William, Jr., was damaged as a result and is entitled to collect from the defendant, Mrs. Wallace, the sum of $150,000 and the assignment to him of a promissory note which he executed to a bank in 1960. Such note, in the principal sum of $10,000, had gone to Mrs. Wallace as a result of the property settlement agreement.

Legal fees in the amount of $7,500 in 1964 and a like amount in 1965 were in fact paid to the law firm of Lyman & Sudduth.

632

The question presented for our decision is whether the petitioner may deduct, under either section 162 or 212, I.R.C. of 1954,[1] the $100,000 in 1964 which he paid to bring about a release from liability in the 1960 and 1962 suits, and the $7,500 in 1964 and $7,500 in 1965 which he expended in legal fees. Against the petitioner's claim, the respondent argues (1) that none of such sums is deductible because the lawsuits arose from the petitioner's personal, family-related activities; (2) that the petitioner's expenditures, if not personal, were nondeductible capital outlays because they were made in defending and perfecting the title to stock; (3) that the expenditures were made to some extent for the benefit and protection of the petitioner's fellow defendants, Robert and the association; and (4) that one-half of the legal fees was in effect paid by Mrs. Wallace and not the petitioner.

If the expenditures made by the petitioner in connection with the 1960 and 1962 suits were personal in nature, then no part of such expenditures could be deducted. Sec. 262. Expenditures made for the purpose of discharging claims, or conducting litigation in connection therewith, are personal in nature if the claims arose as a product of the taxpayer's personal or family life, and not in relation to his profit-seeking business activity. Payments related to a claim which is personal in origin are nondeductible even though their effect is to preserve the taxpayer's income-producing property and his source of livelihood; it is the origin of the claim which distinguishes a business from a personal claim, not the nature of the consequences which would flow from the taxpayer's failure to successfully defend the claim. *United States v. Patrick*, 372 U.S. 53 (1963); *United States v. Gilmore*, 372 U.S. 39 (1963). Because the deductibility of each payment is related to the origin of the claim which gave rise to it, we shall consider separately the origins of the two suits which allegedly precipitated the petitioner's expenditures.

The primary allegation against the petitioner in the 1960 suit was that he failed to deliver stock which he held in trust for William, Jr., and that such failure was wrongful and in violation of an agreement made between William, Jr., and the petitioner at or about the time of the creation of the association. In the amended petition, William, Jr., also made some charges against the petitioner with respect to the former's alleged right of succession to control of the proxy power. However, most of the allegations with respect to William, Jr.'s alleged right to occupy powerful corporate offices and a place on the board of directors, and his alleged right to be named the successor to his father on the proxy signature card, were directed primarily at Robert. The

---

[1] All statutory references are to the Internal Revenue Code of 1954.

judgment finally entered in the 1960 suit, with Mrs. Wallace substituted as defendant, reflects the fact that the primary charges against the petitioner were with respect to the ownership of certain shares of stock. The judgment awarded to William, Jr., the stock which he sought, leaving to his mother the right to substitute other assets with like value.

Expenditures to protect one's title to stock or other property are nondeductible capital outlays, and are not deductible as ordinary and necessary expenses. Such expenditures constitute a part of the cost of the property the title of which is being defended. Sec. 1.263(a)–2(c), Income Tax Regs.; *J. Bryant Kasey*, 54 T.C. 1642, 1648–1649 (1970), on appeal (C.A. 9, Feb. 22, 1971); *Midco Oil Corporation*, 20 T.C. 587, 591 (1953); *Safety Tube Corp.*, 8 T.C. 757, 762–763 (1947), affd. 168 F. 2d 787 (C.A. 6, 1948); *James C. Coughlin*, 3 T.C. 420, 422–423 (1944). As we have noted, the primary dispute in the 1960 suit, insofar as the petitioner was concerned, was with respect to the ownership of the association stock that the petitioner was allegedly holding in trust for William, Jr. The award made in the judgment in that suit was for a specified quantity of such stock, or its equivalent value in substituted assets. To the extent that the claims against the petitioner in the 1960 suit were based upon an agreement to give William, Jr., certain positions of power in the corporation, such other claims were clearly secondary to the claim of ownership of stock, if, indeed, it can be said that those two categories of claims can be clearly separated. The latter point is far from clear; William, Jr.'s desire for positions of power in the corporation seems to have been based largely or entirely on the premise that such power would greatly enhance the value of his *stock*. Indeed, William, Jr., alleged that Robert had increased the value of his stock by nearly $400,000 by virtue of the positions of power and control held by the latter. Therefore, it may very well be that all of the claims against the petitioner in the 1960 suit were either for the stock or for other actions which would increase the value of such stock, and that no claim against the petitioner in the 1960 suit was unrelated to the stock. When the primary issue of a suit is the determination of title, the tax treatment of the associated costs is unaffected by the presence of other requests made in the suit which are dependent upon and incidental to the matter of title. *J. Bryant Kasey*, *supra* at 1649. Thus, we find that the petitioner's expenditures with respect to the 1960 suit were at least primarily to preserve his ownership of association stock and are nondeductible for that reason.

The situation with respect to the claims made in the 1962 suit is largely different. The 1962 claims were based upon the petitioner's actions in having William, Jr., imprisoned, in alleging that he was mentally incompetent and trying to have a guardian appointed for

his estate, and in supposedly damaging William, Jr.'s reputation and standing as a businessman and a lawyer as a result of such actions. The petitioner did not take any of these actions in his capacity as president or stockholder of the association, or in any other business capacity. In taking such actions, he was apparently acting in response to William, Jr.'s threat to kill him and Robert, and not in response to William, Jr.'s demands for stock. The record shows that the petitioner, who was about 70 years old when the threat was made, was put very much in fear of his personal safety. Therefore, to the extent that the petitioner took the actions complained of in the 1962 suit to assuage his fear of being physically harmed, he acted to satisfy his personal needs. To the extent that he took such actions because of an honest belief that his son was mentally incompetent, needed a guardian to look after himself and his property, and required psychiatric care and attention, the petitioner acted to fulfill his responsibility as a father, which is similarly a personal motivation. For these reasons, we find that the claims giving rise to the 1962 suit were personal and that any amounts paid to satisfy such claims were therefore not deductible.

The petitioner argues that William, Jr.'s demands and threats in 1960, and the ensuing actions of the petitioner, grew out of the business relationship between them, and that the existence of such causal relationship renders deductible the resulting expenditures of the petitioner. However, such argument ignores the fact that the petitioner's actions which gave rise to the 1962 suit very substantially exceeded the normal reaction of a businessman who is simply attempting to protect his interest in corporate stock and his position with the corporation. Furthermore, even if the petitioner's actions could be likened in part to the normal reactions of a businessman faced with a similar situation involving a nonrelative, such a conclusion in itself would not cause his expenses to be deductible. To the extent that the petitioner's actions and the resulting lawsuit against him could be attributed to his desire to preserve his stock interests, the related expenses would be nondeductible capital expenditures, as we discussed with respect to the 1960 suit. Therefore, under any view of the situation, the petitioner has failed to show that his expenses related to the 1962 suit are deductible.

Moreover, it is manifestly clear that *all* of the petitioner's expenditures for defending and settling the 1960 and 1962 lawsuits were not for the relief of *his* liability, in any event. Robert was a codefendant in both of those suits, and the association was a codefendant in the 1960 suit; both Robert and the association were relieved from liability as a result of the petitioner's actions. Both sections 162 and 212 limit the deductibility of expenses to those which represent expenses of the taxpayer himself. *Walton O. Hewett*, 47 T.C. 483, 488 (1967) ; *Jacob M.*

*Kaplan,* 21 T.C. 134, 146 (1953). Since no damages were sought from the association, it may be that only a minor amount of the settlement is attributable to its release. However, a much more substantial potential liability existed with respect to Robert. The original petition in the 1960 suit asked that Robert be required to pay $100,000 in actual damages and $100,000 in exemplary damages. The amended petition in the 1960 suit charged that Robert had wrongfully enriched himself by nearly $400,000 by usurping for himself William, Jr.'s right to succeed to the proxy control. The 1962 suit alleged that Robert was jointly liable with the petitioner for the false imprisonment of William, Jr., and other associated torts. Thus, a significant portion of the settlement and related expenses must be allocable to the release of the claims against Robert, and that portion is not an expense of the petitioner and would not be deductible by him in any event.

In addition to the reasons already given for not allowing the petitioner to deduct the disputed expenditures, there is also the problem of allocation. We have no evidence at all indicating the portion of the expenditures allocable to the 1960 suit and the portion allocable to the 1962 suit. There is a similar lack of evidence as to what portion of the expenditures should be allocated to the claims against Robert. Also, we have no basis on which to determine how much might be allocable to the claim by William, Jr., that he was entitled to certain shares of stock in the association, and the portion allocable to his claim to be appointed to certain offices in the association. Even if we were convinced that some of these claims would have otherwise given rise to expenditures deductible at least in part under section 162 or 212, we would be unable to allow any such deduction for the reason that we have absolutely no basis on which to determine the amount to allow. In other words, the petitioner has failed to show that any part of his expenditures was allocable to something other than nondeductible personal expenses and nondeductible capital expenditures pertaining to the ownership of the association stock. *Welch* v. *Helvering,* 290 U.S. 111 (1933) ; Rule 32, Tax Court Rules of Practice.

As to the petitioner's argument with respect to the legal fees paid to Lyman & Sudduth, the respondent points out that the property settlement agreement provided that Mrs. Wallace should receive less cash than the petitioner to the extent of one-half the community's obligation to Lyman & Sudduth, with such one-half portion not to exceed $7,500. Such provision raises a question as to whether Mrs. Wallace did in effect bear one-half of such fees, with Mr. Wallace acting only as a conduit for his wife's funds to that extent. However, in light of our previous conclusions, we need not pass on this question.

*Decision will be entered for the respondent.*