T.C. Memo. 1995-521


UNITED STATES TAX COURT


HARRY D. BLEDSOE AND ANNIE L. BLEDSOE, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 4572-93.                    Filed October 31, 1995.


Ted M. Riseling and Jeff K. Rhodes, for petitioners.

Elizabeth Downs, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, Judge:  Respondent determined deficiencies in
petitioners' Federal income taxes, additions to tax, and a
penalty as follows:

| Year | Deficiency | Additions to Tax | | | Penalty |
|---|---|---|---|---|---|
| | | Sec. 6653(a)(1)(A) | Sec. 6653(a)(1)(B) | Sec. 6661 | |
| 1987 | $91,789 | $4,589 | [1] | $22,947 | |
| | | Sec. 6651(a)(1) | Sec. 6653(a)(1) | Sec. 6661 | |
| 1988 | 40,848 | 8 | $2,050 | 10,212 | |
| | | | | | Sec. 6662 |
| 1989 | 9 | | | | $2 |

[1] 50 percent of the interest due on $91,789.

All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

After concessions, the issues remaining for our consideration are: (1) Whether petitioners are entitled to a bad debt deduction in the amount of $55,000; (2) whether petitioners are entitled to Schedule E deductions for legal fees for 1987 and 1988 in the amounts of $88,199 and $37,419, respectively; (3) whether petitioners are entitled to section 1244 stock loss deductions for 1988 and 1989 in the amounts of $92,500 and $96,503, respectively; (4) whether petitioners received dividend distributions from their S corporation in 1987, 1988, and 1989 in the amounts of $106,212, $66,423, and $48,632, respectively; (5) whether petitioners are liable for additions to tax for 1987 and

1988 and an accuracy-related penalty for 1989 for negligence or intentional disregard of rules or regulations; (6) whether petitioners are liable for an addition to tax for the late filing of their 1988 tax return; and (7) whether petitioners are liable for additions to tax for 1987 and 1988 and an accuracy-related penalty for 1989 for substantially understating their income tax liability.

Petitioners also claim that they had an overpayment of tax for 1989 due to an error made in the notice of deficiency, because, as the parties now agree, petitioners' basis in Resthaven should not be reduced by the amount of dividend distributions.[1]

FINDINGS OF FACT[2]

Petitioners, who during the years in issue were husband and wife, filed joint Federal income tax returns for the years 1987, 1988, and 1989. Petitioners resided in Wichita, Kansas, at all times relevant to this case.

Harry D. Bledsoe (petitioner), a high school graduate, began his career in the cemetery business in 1950. He started as a

---

[1] This Court has jurisdiction to determine the amount of a potential overpayment to which this petition relates. Sec. 6512(b)(1).

[2] The stipulation of facts and the exhibits are incorporated by this reference.

salesman and became a sales or division manager, where he learned to hire and train salesmen to sell cemetery plots in advance of need. Eventually, petitioner became a sales manager for four small cemeteries, where he was responsible for all of their sales in advance of need. Desiring to build his own cemetery operation, petitioner saved his earnings and organized/incorporated Resthaven Gardens of Memory, Inc. (Resthaven), in 1958. During the years at issue, petitioner was the sole shareholder, president, and chairman of the board of Resthaven. In 1958, Resthaven entered into certain land option contracts with petitioner and his then wife, Mary Louise Bledsoe (Ms. Bledsoe). Together, they held an undivided three-fourths interest in land adjoining the Resthaven cemetery. Wichita Developers, Inc., an affiliated corporation, held the remaining one-fourth interest. The land option contracts granted petitioner and Ms. Bledsoe an interest in the gross sales of Resthaven.

In 1979, petitioner filed for divorce from Ms. Bledsoe. The two owned considerable property during their marriage. In 1981, petitioner was granted a divorce, and property division was the principal issue in the divorce proceedings. The divorce decree granted Ms. Bledsoe the right to receive payments from Resthaven on the land option contracts which had previously been payable to

both petitioner and Ms. Bledsoe, and she was granted the entire three-fourths interest in the adjacent land. She was thus required to assume liability for a note and mortgage on that land which was payable to Resthaven.

In 1983, after Ms. Bledsoe did not make certain payments, Resthaven sued her to recover the $14,250 due on the note and to foreclose the mortgage. She counterclaimed, alleging that Resthaven had not paid her certain amounts to which she was entitled under the land option contracts, and that she was not provided with her annual accounting to which she was entitled. In its 1983 petition with the District Court of Sedgwick County, Kansas, Resthaven based its claim on the 1981 divorce decree and alleged that Ms. Bledsoe had failed to comply with the divorce decree. Resthaven's proceeding was ultimately consolidated with the divorce proceeding; both cases were resolved in 1989. The State appellate proceedings, to which the legal fees relate, concerned the property division between petitioner and Ms. Bledsoe. For instance, the court was to determine the value of certain property awarded to Ms. Bledsoe and her rights under the divorce decree.

During 1987 and 1988, Resthaven paid the consolidated litigation legal costs in the amounts of $88,199 and $37,419, respectively. The legal costs included payments for the divorce

case settlement of $66,721 and the Resthaven note case settlement of $14,695.26. The remaining amounts were paid to the attorneys.

In 1986, petitioner, as president and chairman of the board, caused Resthaven to lend $110,000 to Albert Kamas (Kamas), a personal friend. The loan was to help Kamas finance the construction of a gasohol plant. Petitioner, on occasion, asked Kamas to make payments on the loan. In 1987, Kamas informed petitioner that he could not repay/make payments on the loan because the project had lost its government backing. Kamas received a discharge in bankruptcy in approximately 1992.

On May 7, 1987, Diamond Inn Enterprises, Inc. (Diamond), was incorporated. On or about June 1, 1987, Diamond authorized the issuance of 10,000 shares of section 1244 stock, and it received a total of $10,000 from its three incorporators. Seventy-five percent of Diamond's stock was issued to petitioner. Initially, petitioner paid $7,500 to Diamond and, for 1988, deducted a section 1244 loss in the amount of $100,000. In order to support the claimed loss, petitioner relied on each shareholder's postincorporation payments in amounts proportionate to his Diamond stock ownership percentage. From its incorporation through its failure in 1988, Diamond recorded loans from shareholders in the total amount of $252,004. Petitioner's accountant subsequently determined that the $252,004 should not

have been reflected on Diamond's books as loans from shareholders. The postincorporation amounts contributed by Diamond shareholders were capital contributions which were not in payment of section 1244 stock.

On February 28, 1987, Resthaven's parent corporation, Developer and Management, Inc. (Developer), ceased operation and merged with Resthaven. On March 1, 1987, Resthaven became an S corporation. During 1987, when S corporation treatment was elected for Resthaven, the deferred gross profits of the prior C corporation were picked up and included in Resthaven's income over the next 4 years. This occurred because Resthaven changed from the installment to the cash method of tax accounting. Resthaven included these "built-in gains" in income: $262,875, $197,156, and $139,831 in 1987, 1988, and 1989, respectively.

Respondent determined that Resthaven paid some of petitioners' personal expenses and that the amount of those expenditures should be treated as dividend income to petitioners. During the administrative proceeding, petitioner's accountant discovered that Resthaven had unrecorded liabilities for 4,000 burial vaults. He conducted a sampling of invoices and determined that $150 was the average cost of a burial vault and that $50 was the cost of putting the vault into the ground. Petitioner's accountant, accordingly, determined that Resthaven

had $800,000 of unrecorded liabilities which should have been offset against the S corporation's earnings and profits. Respondent did not reduce the earnings and profits by any portion of the unrecorded liabilities in the notice of deficiency determination.

Petitioners filed their 1988 joint Federal income tax return after October 31, 1989, and they had not requested an extension of time in which to file their return. Petitioners conceded the following adjustments: Resthaven's travel and entertainment expenses of $14,937, $14,828, and $47,928 for 1987, 1988, and 1989, respectively; a $15,400 reduction in Resthaven's cost of goods sold; Resthaven's equipment lease expense of $1,183, $8,882, and $8,076 for 1987, 1988, and 1989, respectively; Resthaven's vehicle insurance expense of $412, $933, and $1,805 for 1987, 1988, and 1989, respectively; disallowed medical expense for 1987; and an adjustment to miscellaneous itemized deductions for 1987.

## OPINION

Bad Debt

Resthaven lent petitioner's friend, Mr. Kamas, $110,000 in December 1986. Petitioner caused his corporation to lend Kamas $110,000 so that Kamas could participate in the building of a

gasohol plant. Respondent agrees that this loan would be deductible to the extent that it became worthless in 1987. We must decide whether any part of Resthaven's loan to Kamas became worthless in 1987. Sec. 166(a). Petitioners bear the burden of proving that Resthaven's loan to Kamas became worthless in 1987. Rule 142(a).

Respondent argues that there were no identifiable events in 1987 that would support a finding that $55,000 of the $110,000 debt was worthless. Respondent contends that the only event which would have evidenced the loan's worthlessness was Kamas' bankruptcy discharge in 1992 and that the events relied on by petitioners are speculative. We disagree.

In 1987, the gasohol plant project did not proceed because it lost its government backing. Petitioner asked Kamas to pay the loan back, and Kamas could not pay the principal or the interest. During 1987, petitioner also discovered that Kamas had substantial financial obligations to a bank. Because the bank could not collect its debt from Kamas, petitioner believed that Resthaven would not collect its debt. By late 1987, the loan to Kamas was approximately 1 year old and no payments had been made. After discussions with his accountant, petitioner expected that Resthaven would collect only half of the $110,000 debt.

A bad debt is deductible only in the year that it becomes worthless.  <u>Denver & R.G. W. R.R. v. Commissioner</u>, 32 T.C. 43 (1959), affd. 279 F.2d 368 (10th Cir. 1960).  Petitioner has shown that, in 1987, Kamas' debt to Resthaven became partially worthless.  We hold that petitioner's judgment and conclusion about worthlessness were reasonable and are supported by the record.  Respondent argues that, if the loan became worthless, it happened in 1992; i.e., when Kamas' bankruptcy discharge occurred.  We believe, however, that Kamas' 1992 bankruptcy discharge was simply the result of his 1987 financial troubles, and resulted in the worthlessness of the remainder of the loan.

Petitioners are entitled to a $55,000 bad debt deduction for 1987.

## Legal Expenses

Petitioners claimed professional fees of $134,985 for 1987 and $80,885 for 1988.  Respondent disallowed $88,199 and $37,419 for 1987 and 1988, respectively, determining that petitioners had not established that these amounts were ordinary and necessary legal expenses of the cemetery business.  Respondent contends that these payments were made in connection with petitioner's divorce proceedings.  Petitioners bear the burden of showing that these expenses were ordinary and necessary business expenses of Resthaven.  Rule 142(a).

Petitioner's litigation began in 1979 when he sought a divorce from his former wife, Ms. Bledsoe. This litigation required the division of extensive property that had been acquired during their marriage. After the divorce was granted in 1981, Ms. Bledsoe appealed the decision, claiming that the court abused its discretion regarding the property division. The divorce decree was affirmed.

In 1983, Resthaven sued Ms. Bledsoe for $14,250 plus interest for the balance due on the note that she had assumed. Resthaven's claim was based in large part on the divorce decree. Ms. Bledsoe counterclaimed and argued that petitioner and Resthaven had failed to fulfill their obligations to her under the divorce decree. In 1985, Ms. Bledsoe confessed judgment on the note and mortgage, and in 1989, this litigation ended.

Section 162 provides taxpayers with deductions for all "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". Section 212 allows deductions for all

> ordinary and necessary expenses paid or incurred during the taxable year--
>
>> (1) for the production or collection of income;
>>
>> (2) for the management, conservation, or maintenance of property held for the production of income * * *

We must decide whether any of the claimed legal expenses which petitioners deducted were attributable to Resthaven's cemetery business and, therefore, deductible under either section 162 or 212.

In United States v. Gilmore, 372 U.S. 39, 49 (1963), the Supreme Court held that the proper time for characterizing an expense as either "business" or "personal" is when the expense is incurred. The U.S. Court of Appeals for the Tenth Circuit, based on the Supreme Court's holding, formulated the "origin of the claim" test. That test must be separately applied to the divided parts: the divorce action and the action in which the corporation was a party. Dolese v. United States, 605 F.2d 1146, 1151 (10th Cir. 1979). Hence, we must decide the origin of the expenditures as they apply to petitioners and to Resthaven. Wallace v. Commissioner, 56 T.C. 624, 632 (1971).

This Court has held that, when appropriate, litigation expenses should be allocated between personal and business costs. Michaels v. Commissioner, 12 T.C. 17 (1949). "Such an allocation between deductible and non-deductible expenses is not unusual, * * * although 'a rough approximation is all that can be expected.'" Burch v. United States, 698 F.2d 575, 579-580 (2d Cir. 1983) (quoting Ditmars v. Commissioner, 302 F.2d 481, 488 (2d Cir. 1962), revg. and remanding T.C. Memo. 1961-105).

The evidence regarding the legal expenses consists of two joint exhibits and the testimony of petitioners' witnesses. One exhibit is the petition for enforcement of Resthaven's rights under the divorce decree between petitioner and Ms. Bledsoe. The other exhibit is the memorandum opinion from an appeal by petitioner and Resthaven which, the court notes, represents the "aftermath of the divorce granted to the parties in 1981." At the trial here, petitioner's witness Edwin Carpenter, an attorney who was personally involved with the divorce litigation, explained that the litigation was consolidated in order to address the rights and obligations of both Ms. Bledsoe and Resthaven.

It is evident that Resthaven had an interest in protecting and conserving its corporate assets, which were at risk in the consolidated litigation. Resthaven was a party to a portion of these proceedings, and it had financial interests in protecting its assets independent of petitioner. Specifically, it claimed rights to the proceeds of the note on which Ms. Bledsoe was liable. If Ms. Bledsoe had prevailed in her counterclaim, Resthaven and its cemetery might have suffered substantial economic hardship. Although the proceedings were "an aftermath of the divorce", as the court which entertained petitioner's and Resthaven's appeal noted, Resthaven had a financial stake in a

part of the proceedings. Accordingly, we find that the part of these proceedings in which Resthaven had an interest originated with respect to Resthaven.

After examining the evidence and analyzing the breakdown of the legal fees, we hold that, in 1987 and 1988, 35 percent of the amount disallowed by respondent was, in fact, incurred to maintain the property held by Resthaven and is deductible.[3] See sec. 212; Burch v. United States, supra.

Section 1244 Stock

Ordinary loss treatment is available to those individuals with "section 1244 stock" in a corporation with total equity of $1 million or less. The section 1244 stock must have been originally issued to them for money or property by a domestic small business corporation. Sec. 1244(a), (c). Section 1244 stock loss deductions cannot exceed $50,000 (or $100,000 if a joint return was filed) per annum. Sec. 1244(b).

For 1988 and 1989, petitioners claimed section 1244 losses on their Diamond stock. Petitioners assert that they were entitled to an ordinary loss deduction of $196,503, the amount of their claimed basis in Diamond. Due to the section 1244

---

[3] We note that $600.75 of the fees paid to Carpenter, Hein, Carpenter was paid in 1989, but has not been placed in issue for 1989.

limitation, petitioners deducted $100,000 in 1988 and the $96,503 remainder as an ordinary loss carryover for 1989.[4]  Respondent determined that petitioners' ordinary section 1244 loss deduction was limited to $7,500, which respondent contends was the amount that petitioners paid for the stock when it was issued.

If a shareholder owns section 1244 stock and makes additional capital contributions and receives no additional shares of stock, then the basis in the stock increases.  However, such an increase in basis "shall be treated as allocable to stock which is not section 1244 stock."  Sec. 1244(d)(1)(B).  Any additional contributions to capital for which one receives no additional stock are not eligible for section 1244 ordinary loss treatment.  Id.

The parties here agree that the stock at issue is "section 1244 stock" as defined in section 1244(c).  We must decide whether petitioner's payments subsequent to the initial $7,500 were for the issuance of additional section 1244 stock or were capital contributions to be treated as "allocable to stock which is not section 1244 stock."  Id.

---

[4] At trial, petitioners acknowledged that, should they prevail on this issue, their sec. 1244 ordinary loss deduction should have been limited to $100,000 in 1988 with the balance as a capital loss carryover.  See secs. 1212, 1244(b).

Diamond was incorporated on May 7, 1987.  On June 1, 1988, Diamond held its first shareholders' meeting.  The minutes of this meeting specified that, on June 1, 1987, Diamond was authorized to issue 10,000 shares of section 1244 common stock.  The section 1244 plan stated that the maximum amount of consideration that could be received by Diamond for the issuance of this stock would be $1 million.  Accordingly, even though $1 million was authorized, only $10,000 was paid for the 10,000 shares issued.  In that regard, the minutes of Diamond's first meeting on June 1, 1988, reflect that petitioner, as one of the incorporators, contributed $7,500 of the initial $10,000.  Of the 10,000 shares of stock that Diamond had issued on June 1, 1987, petitioner received 75 percent or 7,500 shares.  Although additional amounts over $10,000 were later paid to the corporation, those payments were not designated as payment for the 10,000 shares issued on June 1, 1988.

Petitioner relies heavily on Miller v. Commissioner, T.C. Memo. 1991-126.  In that case, the taxpayer formed a corporation with another individual for the purpose of constructing a water amusement park.  The articles of incorporation provided for the issuance of 100,000 shares of common stock at $1 par value per share.  The taxpayer and another individual were the directors, and each paid one-half of the fees for incorporation or $210.  A

stock certificate was issued which represented that the taxpayer owned 30,250 shares of stock. The taxpayer and the other shareholders paid debts of the corporation. Subsequently, a new stockholder was brought in and paid $43,000 in exchange for 20,000 shares.

In Miller v. Commissioner, supra, this Court cited Morgan v. Commissioner, 46 T.C. 878, 890 (1966), where it was reasoned that "when stock is paid for, it is normally considered issued in fact, irrespective of the manual issuance of the certificate." The taxpayer in Miller v. Commissioner, supra, believed that, by paying one-half of the corporate expenses, such payments would be applied towards the purchase of his stock. The taxpayer's only monetary contribution at the time of incorporation was a $210 incorporation fee. Because 100,000 shares of stock were authorized, as a 50-percent owner, the taxpayer in Miller would have received 50,000 shares. This, along with the fact that the new shareholder paid $43,000 for her 20,000 shares, evidenced the fact that the $210 initial payment was not consideration for the stock.

While Morgan v. Commissioner, supra, does not require the issuance of a certificate to evidence the fact that stock was issued, in the instant case, the minutes of Diamond's meeting clearly state that 10,000 shares were authorized and were issued

on June 1, 1988:  7,500 shares to petitioner for $7,500 and 2,500 shares to the other shareholders for $2,500.

Petitioner recalled virtually no details regarding the issuance of the Diamond stock.  When asked about the stock, he did state that his $7,500 payment was made "to start the financial corporation."  Moreover, he remembered that he "was to own 75 percent of the corporation", yet he could not remember when and if he received shares of stock.  Finally, petitioner did state that the other shareholders and he would calculate what additional funds Diamond needed, and they would contribute based on their original ownership percentage.  There is no evidence that petitioner or the other shareholders sought to issue additional stock, that these payments were part of the original issue of stock, or that the shareholders intended to somehow change their ownership percentage.

The premise of petitioners' position is that there was an understanding that the 10,000 authorized shares were being issued for an amount in excess of $10,000 or $1 per share.  While, as a practical matter, such a premise would appear logical and reasonable (i.e., the business needed more than $10,000 capital and possibly petitioner intended all payments to be in exchange for section 1244 stock), the record here does not support petitioners' premise.  Accordingly, we find that petitioner's

additional contributions to Diamond made after the issuance of its 10,000 shares constituted contributions to capital which, while increasing the basis of the stock, are treated as "allocable to stock which is not section 1244 stock."  Sec. 1244(d)(1)(B).

Dividend Income

In March 1987, Resthaven merged with its parent and converted from a C corporation to an S corporation.  The S corporation included deferred gross profit of the former C corporation in its income over the next 4 years, 1987 through 1990, because Resthaven changed from the installment method to the cash method of accounting.  See sec. 481; sec. 1.1374-4(h), Income Tax Regs.  The gross profit of the former C corporation constituted earnings and profits to Resthaven.  Respondent determined that Resthaven had made expenditures for the personal benefit of petitioner and members of his family, and, therefore, petitioners realized dividend income in 1987, 1988, and 1989 in the amounts of $106,212, $66,423, and $48,623, respectively.

Section 1368(c)(2) provides that distributions from an S corporation with accumulated earnings and profits are dividends to the extent that such distributions exceed the corporation's accumulated adjustments account (AAA) and do not exceed earnings

and profits.[5]  Respondent contends that Resthaven paid certain
personal expenses of petitioner during the years at issue and
that these payments were dividends to petitioner.  Petitioners do
not dispute that Resthaven paid these expenses.  See, e.g., Old
Colony Trust Co. v. Commissioner, 279 U.S. 716, 729-731 (1929).
They claim, however, that Resthaven's earnings and profits should
be reduced by certain unbooked liabilities of the C corporation
and that the expense payments were not dividends.  Petitioners
claim that 4,000 previously sold burial vaults which should have
been recorded on Resthaven's books in 1984 were not.  The
unrecorded liabilities would have reduced the income reported for
sales in advance of need.  Petitioners have the burden of proving
that these liabilities existed and that they should have been
recorded.  Rule 142(a).

The unrecorded liabilities were discovered in connection
with a proposal to purchase Resthaven.  In correspondence, the
undisclosed liabilities were expressed as the reason the proposal
did not come to fruition.  The failure to record the liability

---

[5] If an S corporation has earnings and profits,
distributions generally (to the extent of the shareholder's
basis) can be made tax free to the extent of the corporation's
accumulated adjustments account (AAA) to the extent of the
shareholder's basis.  Sec. 1.1368-2(a), Income Tax Regs.,
promulgated in 1993, provides that an AAA is relevant for all tax
years beginning on or after Jan. 1, 1983, for which the
corporation is an S corporation.

for the vaults was discovered after the returns in question were filed, and it was raised during the administrative audit. The accountant conducted a random sampling of the universe of invoices and was able to arrive at an average cost of $150 per vault. He also was able to determine that the average cost to install the vaults should have been $50 each. Through this methodology, it was established that the corporation had an $800,000 (4,000 x $200) unrecorded liability.

Petitioners have carried their burden of showing the existence of Resthaven's unrecorded burial vault liability of $800,000. Consequently, petitioners did not receive dividend income in the amounts determined by respondent during the years in issue.

## Negligence

Respondent determined that petitioners are liable for additions to tax and a penalty for negligence or intentional disregard of rules or regulations during the years at issue, under their respective sections in 1987, 1988, and 1989. Petitioners have the burden of showing that they were not negligent with respect to their tax returns at issue. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972).

Negligence is a "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the

circumstances."  Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part 43 T.C. 168 (1964) and T.C. Memo. 1964-299.

Regarding the section 1244 loss and loss carryover petitioners claimed for 1988 and 1989, respectively, the evidence produced was insufficient for us to conclude that they had paid more than $7,500 for their section 1244 stock.  Petitioners' argument that the subsequent payments were in exchange for section 1244 stock may be a plausible one but is an untested concept.  Petitioners had met the other requirements of section 1244 but failed solely because the subsequent payments could not be factually linked to the 7,500 shares of section 1244 stock issued in 1987.  Consequently, we find that petitioners were not negligent with respect to their section 1244 loss deduction.

Respondent disallowed legal fees in 1987 and 1988, asserting that these were personal expenses of petitioners rather than business expenses of Resthaven.  We have found that 35 percent of the disallowed expenses were, in fact, incurred by Resthaven in the ordinary course of its cemetery business.  However, our determination required that we make a reasonable estimate, as petitioners' records were quite difficult to analyze in this case.  With respect to the disallowed portion of legal fees which we sustain and regarding the other disallowed items conceded by

petitioners, petitioners failed to produce adequate records from which to sustain their deductions. Therefore, to the extent that the amount petitioners claimed for legal fee deductions was excessive and to the extent petitioners conceded some items, we find that they were negligent.

Late Filing

Respondent determined that petitioners are liable for an addition to tax for filing their 1988 return past its due date. The addition to tax applies unless it is shown that the failure to timely file is due to reasonable cause and not due to willful neglect. Sec. 6651(a)(1). Because petitioners have not shown that they had reasonable cause or that their failure to timely file was not due to willful neglect, we find that they are liable for the addition to tax for failing to timely file their 1988 tax return.

Substantial Understatement

Respondent determined that petitioners are liable for additions to tax for substantially understating their income tax. Income tax is substantially understated if, in any year, the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000. Secs. 6661 and 6662.

Any such understatements are reduced by that portion for which there is "substantial authority" or where the transaction has been "adequately disclosed". For 1987 and 1988, there were several items determined by respondent, some of which were sustained by this Court. Petitioners have not shown that, factually or legally, there was substantial authority for the items composing the understatements. Furthermore, petitioners did not adequately disclose their legal fee deductions through Resthaven. Regarding the section 1244 stock sale, however, we do find adequate disclosure in petitioners' 1988 tax return. Through an attached statement, petitioners fully disclosed the identity of the corporation, their proposed section 1244 basis, and the date that the corporation closed. Therefore, for purposes of the section 6661 addition to tax, petitioners' understatement is reduced by that portion which relates to petitioners' section 1244 stock deduction.

For 1989, respondent seeks the accuracy-related penalty under section 6662. As we have already discussed the issue of petitioners' negligence with respect to their 1989 year, we shall address only the substantial understatement aspect of section 6662. Respondent determined that petitioners' deficiency was $9. The amount of income tax required to be shown on their return was over $70,000. For 1989, petitioners' understatement of $9

neither exceeded 10 percent of the amount required to be shown, nor was over $5,000.  Hence, the understatement was not substantial as defined by section 6662.

Petitioners' Claim for Refund

The parties agree that the notice of deficiency contains an error in the calculation of petitioners' basis in Resthaven. They have further agreed that petitioners' basis in Resthaven should not be reduced by the amount of dividend distributions. The parties are to reflect their agreement in the Rule 155 computation.

To reflect the foregoing,

Decision will be entered

under Rule 155.